# United States Court of Appeals
## For the First Circuit

No. 03-1275

NERLANDE JEAN LAURENT,

Petitioner,

v.

JOHN ASHCROFT, ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER

OF THE BOARD OF IMMIGRATION APPEALS

Before

Selya, <u>Circuit Judge</u>,

Coffin and Cyr, <u>Senior Circuit Judges</u>.

<u>Joan M. Altamore</u> on brief for petitioner.
<u>Peter D. Keisler</u>, Assistant Attorney General, Civil Division, <u>Linda S. Wernery</u>, Senior Litigation Counsel, Office of Immigration Litigation, and <u>Brenda M. O'Malley</u>, Attorney, Office of Immigration Litigation, on brief for respondent.

February 27, 2004

**SELYA**, **Circuit Judge**.  Nerlande Jean Laurent, a citizen of Haiti, seeks judicial review of a final order of the Board of Immigration Appeals (BIA) denying her application for asylum and withholding of deportation.  She asserts that the BIA erred in refusing to find that the Immigration Judge (IJ) had (i) violated her due process rights while conducting the removal proceedings, and (ii) incorrectly determined that the petitioner had not presented sufficient credible evidence to support her claim for asylum and withholding of deportation.[1]  Finding these arguments unpersuasive, we uphold the BIA's order.

## I.  BACKGROUND

The petitioner initially filed for asylum in May of 1999.  She retained Guantanamo Consultants, Inc. (Guantanamo) to prepare her application and paid that firm $500.  In that application, she claimed that she had been raped, beaten, and threatened with death due to her and her family's political ties with a deposed dictator (Jean-Bertrand Aristide).  She further claimed that she had entered the United States illegally in 1998 to escape political persecution.

In July of 1999, an asylum officer interviewed her and found both her application and her confirmatory testimony lacking

---

[1]If the BIA's rejection of the petitioner's asylum claim withstands review, her claim for withholding of deportation also must fail.  See Ipina v. INS, 868 F.2d 511, 515 (1st Cir. 1989). Accordingly, we refer, for the most part, only to her asylum claim.

in credibility. Two months later, the Immigration and Naturalization Service (INS) initiated removal proceedings against the petitioner. At her removal hearing, she admitted that she was removable as charged and resubmitted the same application for asylum. On January 23, 2001, however, she amended her application and totally repudiated her original claims of political persecution. She grounded her amended application on claims of persecution and abuse arising out of her membership in a particular social group, i.e., women being victimized by domestic violence.

On October 16, 2001, the IJ held a hearing on the petitioner's amended application. At the time, the petitioner disclaimed her original application, stating that the bogus allegations of political persecution had been invented by Guantanamo and that Guantanamo had given her a cassette tape that she had parroted in attempting to answer the questions asked during her initial interview. The true story, she said, was that she had been physically, sexually, and emotionally abused by one Benold Jean-Louis from 1987 to 1992. She went on to say that she had come to the United States in 1992, with a fraudulent passport, to escape from this unwholesome relationship. The alleged mistreatment included forced abortions and underwriting other women's abortions at Jean-Louis's insistence. She did not report any of these events to authorities; in her view, doing so would have been futile given the status of women in Haiti.

Strangely, however, the petitioner's flight did not end her relationship with Jean-Louis. She admitted that she maintained telephone contact with him throughout her stay in the United States. Moreover, she testified that Jean-Louis wanted her to get a green card so that she could continue to support him. Accordingly, she married Ronel Remi in 1995 (on Jean-Louis's recommendation) in the hope that he would help her secure a green card. Remi did not deliver, and the petitioner divorced him in 1997.

In July of 1999, Jean-Louis visited the petitioner in the United States. He remained for about a month. The following April, the petitioner gave birth to Jean-Louis's child. Jean-Louis then returned to the United States for a month-long visit with the petitioner.

In the face of this testimony, the IJ found that the petitioner's credibility had been compromised both by her original (false) application and by her lies to the asylum officer. He further found that there was no corroboration for her claims of abuse, and that the fact that she persisted in maintaining a relationship with Jean-Louis throughout her stay in the United States undermined her testimony. Accordingly, he denied her application for asylum. The BIA summarily affirmed the IJ's ruling.

## II.  ANALYSIS

We examine sequentially the petitioner's claims that the BIA erred in approving (i) the IJ's conduct of the hearing, and (ii) his denial of the asylum claim.

### A.  <u>Fairness of the Hearing</u>.

The petitioner argues that the IJ violated her Fifth Amendment right to due process by refusing to hear pertinent testimony and by exhibiting bias against her.  We review de novo the question of whether a judicial officer's conduct violates due process.  <u>Aguilar-Solis</u> v. <u>INS</u>, 168 F.3d 565, 568 (1st Cir. 1999).  After careful perscrutation of the transcript, we find no due process violation here.

The petitioner complains that the IJ interrupted pertinent lines of questioning, denying her the right to a full and fair hearing.  That complaint is more cry than wool.  A party is entitled to a fair hearing, not a perfect one, and within wide margins — not approached here — a judge's efforts at routine administration of court proceedings do not offend principles of fundamental fairness.  <u>See</u> <u>Logue</u> v. <u>Dore</u>, 103 F.3d 1040, 1045 (1st Cir. 1997).

This does not mean, of course, that judges have carte blanche to act arbitrarily or to cross the line that separates judicial officers from litigants.  A judge must maintain a standard of balance and impartiality, and a reviewing court will look to the

-5-

facts of each particular case to determine whether the judge's actions unfairly prejudiced any of the parties. See id. We find no such undue prejudice here.

The petitioner cites three specific instances in which (she says) the IJ's interjections were prejudicial to her cause. First, the IJ attempted to prod her attorney past introductory matters, beseeching him, inter alia, to "get into what happened." Viewed in context, this statement and others like it were apt — and there is nothing to suggest that they foreclosed pertinent testimony. An immigration judge's broad discretion easily encompasses such things as endeavoring to expedite trial proceedings. Aguilar-Solis, 168 F.3d at 568. Any perceived brusqueness was, therefore, merely a symptom of the IJ's impatience. See Morales v. INS, 208 F.3d 323, 327-28 (1st Cir. 2000).

The second instance of allegedly impermissible conduct involves the IJ's statement that he did not want to hear details of the abuse. A closer look at the record reveals that this comment occurred at the tail end of the petitioner's direct testimony and followed a thorough airing of her allegations of rapes, beatings, and other mistreatment at Jean-Louis's hands. In virtually the same breath, the IJ acknowledged that he understood fully the petitioner's contention that she had been raped, beaten, and abused by Jean-Louis. Common sense suggests that trial judges must be

accorded considerable leeway in cutting off cumulative or redundant testimony, and the case law so holds. See, e.g., Desjardins v. Van Buren Cmty. Hosp., 969 F.2d 1280, 1281 (1st Cir. 1992) (per curiam). The IJ did not misuse this discretion by refusing to allow the petitioner to repastinate soil already well turned. See Aguilar-Solis, 168 F.3d at 568.

The third incident of allegedly prejudicial conduct occurred when the IJ refused to take testimony by telephone from a clinical psychologist, Muriel Weckstein. In the petitioner's view, this testimony was vital because it was not until she consulted with Weckstein that she realized that she was a victim of domestic abuse and was able to relate this tale to her attorney.

The supposed blocking of Weckstein's testimony is a non-issue. First, there is considerable room to doubt whether Weckstein was available to testify telephonically when the request was made (the petitioner apparently had arranged with Weckstein to hold herself available by telephone on the day of the hearing from 10:00 a.m. to 11:00 a.m., but no mention of having her testify was made to the IJ until 11:20 a.m). Second, Weckstein's affidavit — her statement of opinion as to the petitioner's condition — was in the record and was fully considered by the IJ (who noted, inter alia, several discrepancies between the petitioner's testimony and statements she had made to Weckstein). Because the IJ received and

considered this evidence, the petitioner's due process rights were not abridged.

This leaves the petitioner's allegations of bias. These allegations have their genesis in the IJ's statement, prior to the commencement of the removal hearing, that he would not have allowed the petitioner to file a second asylum application. The petitioner asseverates that this statement demonstrates that the IJ had formed an adverse opinion about her credibility before taking any evidence.

The record belies the petitioner's claim. The IJ made it very clear that he was merely voicing his disagreement with the procedure that had been employed to authorize the filing of the second asylum application. As he explained, "what I do is I take an affidavit from the [petitioner] indicating what the different facts are and why the first application was incorrect." It hardly can be deemed a violation of due process for a presiding judge to comment upon the procedure used to compile the record before him. Liteky v. United States, 510 U.S. 540, 555 (1994).[2]

_____

[2]In all events, the mere fact that a judge forms a preliminary opinion about the facts based on an initial review of the record does not render a proceeding fundamentally unfair. Judges quite properly may form opinions before the end of a bench trial. See Liteky, 510 U.S. at 555 ("[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings . . . do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.").

## B. __The Merits__.

We turn now to the petitioner's challenge to the BIA's denial of her claim for asylum. In order to establish eligibility for asylum, an alien bears the burden of demonstrating that she is a refugee. See 8 U.S.C. § 1158(b)(1); 8 C.F.R. § 208.13(a). "Refugee" is defined in the Act as a person who cannot or will not return to her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). In the case at hand, the IJ found that the petitioner failed to establish either past persecution or a well-founded fear of future persecution based on one of the five enumerated grounds. The BIA adopted this finding. We test its provenance.

The Act requires that the BIA's findings of fact be upheld "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). This is a deferential standard that permits reversal on insufficiency grounds only when the record evidence points unerringly in the opposite direction. INS v. Elias-Zacarias, 502 U.S. 478, 481 & n.1 (1992). In other words, for the petitioner to succeed in her sufficiency-of-the-evidence challenge, "the administrative record, viewed in its entirety, must compel the conclusion that [s]he is asylum

eligible." Aguilar-Solis, 168 F.3d at 569. The record here is inadequate to this task.

The petitioner's claim revolves around her story of physical, sexual, and emotional abuse at the hands of Jean-Louis. She deems this abuse tantamount to a showing that she was persecuted on account of her membership in a particular social group: women subject to domestic violence. This claim is suspect on its face. See Lukwago v. Ashcroft, 329 F.3d 157, 170-72 (3d Cir. 2003) (discussing what constitutes a particular social group). We need not probe that point too deeply, however, because the record supports the IJ's determination that the petitioner's credibility was severely impaired and that her evidence, to the extent it was credible at all, did not establish past persecution.[3]

The petitioner asserts that her testimony, together with the State Department country conditions reports (Haiti) for 1999 and 2000, demands a finding of past persecution. We do not agree. An immigration judge does not have to accept every witness's testimony at face value. To the precise contrary, a central part of a trial judge's job is to evaluate a witness's veracity. Aguilar-Solis, 168 F.3d at 570-71.

_____

[3]We discuss the IJ's findings because they have become the BIA's. Where, as here, the BIA conducts a de novo review of the record, independently validates the sufficiency of the evidence, and adopts the IJ's findings and conclusions, the IJ's findings become the BIA's. See Aguilar-Solis, 168 F.3d at 570 n.4; see also 8 U.S.C. § 1252(b)(4)(A).

-10-

We add, moreover, that a witness's demeanor is often a critical factor in determining her truthfulness. See Cordero-Trejo v. INS, 40 F.3d 482, 491 (1st Cir. 1994). Where, as here, the judicial officer who saw and heard the witness makes an adverse credibility determination and supports that determination with specific findings, an appellate court should treat that determination with great respect. See Nasir v. INS, 122 F.3d 484, 486 (7th Cir. 1997). Nothing in the record before us suggests that we should not honor the credibility determination made below. We explain briefly.

In evaluating the petitioner's credibility, the IJ found that her admittedly fraudulent original application, coupled with her rehearsed (and equally false) testimony at her initial asylum interview, fairly illustrated her propensity to dissemble under oath. This negative impression was reinforced by the fact that the petitioner had married Remi for the express purpose of obtaining a green card (and, thus, skirting the law). The IJ found the petitioner's new story equally suspect: she had maintained continuous communication with her alleged batterer even after traveling over sixteen hundred miles to a foreign land and had never once complained to the authorities (either in Haiti or in the United States) about him. Finally, citing book and verse, the IJ also found that the account given by the petitioner to the clinical psychologist was inconsistent with her testimony at the hearing.

Because the record amply supports these findings, the IJ's credibility determination must stand.

The short of the matter is that, based on the petitioner's previous prevarication and the inconsistencies in her account, the IJ had good reason to doubt her veracity. His finding that she did not carry the burden of proof on the issue of past persecution follows readily from her lack of credibility. Because the evidence does not compel a contrary conclusion, this determination passes muster.[4]

That holding does not end our journey. A second way in which an alien may establish a right to asylum is by showing a well-founded fear of future persecution. Here, too, the petitioner's lack of credibility is critically important.

The standard for proving a well-founded fear of future persecution has both objective and subjective components. See Alvarez-Flores v. INS, 909 F.2d 1, 5 (1st Cir. 1990). In order to establish asylum eligibility, an applicant must not only harbor a

---

[4]The petitioner suggests that this determination is undercut by the IJ's failure to take into account the State Department reports of conditions in Haiti. That suggestion lacks force. To be sure, these reports document widespread violence against Haitian women and note that victims often do not report such abuse. As such, the reports tend to make the petitioner's story more credible. But such generalized information cannot be allowed to trump the IJ's specific, well-substantiated finding that the petitioner was spinning a yarn. See, e.g., Fesseha v. Ashcroft, 333 F.3d 13, 20 (1st Cir. 2003) (explaining that evidence of country conditions does not establish a prima facie case of asylum eligibility when petitioner has not established that she, personally, would be targeted).

genuine fear of future persecution, but also must establish an objectively reasonable basis for that fear. Id. The petitioner fails to meet the second part of this binary standard.

From an objective standpoint, an applicant for asylum must show by credible evidence that her fear of future persecution is reasonable. See id. Taken at face value, the appellant's position — that she fears future persecution at Jean-Louis's hands, yet maintained continuous contact with him after her emigration — is unconvincing. And there is no need to take that position at face value: the only particularized evidence in the record tending to prove a likelihood of future persecution is the petitioner's testimony — and the IJ deemed that testimony incredible. Because that credibility determination is fully supportable, see supra, there is no hook on which to hang a well-founded fear of future persecution.

## III.  CONCLUSION

We need go no further. We conclude, without serious question, that the petitioner received a fair hearing, consistent with the dictates of the Due Process Clause, and that the BIA's rejection of her claims for asylum and withholding of deportation are supported by substantial evidence in the record. No more is exigible.

**Affirmed**.

-13-