File Name: 05a0449n.06
Filed: May 27, 2005

**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

**NO. 03-4003**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **ALFRED LACINAJ,** | ) | |
| | ) | |
| **Petitioner-Appellee,** | ) | **PETITION FOR REVIEW OF AN** |
| | ) | **ORDER OF THE BOARD OF** |
| **v.** | ) | **IMMIGRATION APPEALS** |
| | ) | |
| **JOHN ASHCROFT,** | ) | |
| **U.S. ATTORNEY GENERAL,** | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |

**BEFORE: COLE and GILMAN, Circuit Judges; and POLSTER, District Judge.[1]**

**Dan Aaron Polster, District Judge.** Petitioner Alfred Lacinaj, a citizen of Albania, seeks

review of a final order of the Board of Immigration Appeals ("BIA") affirming the Immigration

Judge's decision to deny his claims for asylum and withholding of deportation under the

Immigration and Nationality Act ("INA") and relief under the Convention Against Torture ("CAT").

---

[1]The Honorable Dan Aaron Polster, United States District Judge for the Northern District of
Ohio, sitting by designation.

Lacinaj asserts that the Immigration Judge ("IJ") erred when she found his testimony to be incredible and when she excluded certain hearsay testimony of Lacinaj's employer. Because we conclude that the IJ's adverse credibility determination was supported by substantial evidence, and her decision to exclude evidence did not violate due process, we **AFFIRM** the BIA's decision and **DENY** Petitioner's request for review.[2]

## I.

Petitioner Alfred Lacinaj is an Albanian citizen who entered the United States on or about December 1, 1993, as a nonimmigrant visitor for pleasure with authorization to remain until June 1, 1994. In January 1994, Lacinaj, through counsel, filed an application for asylum wherein he asserted the following facts. Lacinaj fled from Albania to Yugoslavia in 1982 "because of the oppressive and dictatorial regime of the Communists and their persecution of the Catholic minority." He lived in the part of Kosovo, Yugoslavia, where the Albanians lived and "became active in demonstrations against the Serbian government for its inhuman treatment of the Albanian Yugoslavian." He was arrested in 1991 after participating in a pro-Albanian demonstration, detained overnight and warned not to participate in such demonstrations again. According to Lacinaj, he could not live in Albania "because I have nothing and I left it when I was persecuted as a Catholic minority in a Muslim [sic] majority and being anti Communist. I lived for the past 10 years in Yugoslavia and now I have been persecuted in Yugoslavia for my political activities and opinions." When asked on the application what he thought would happen to him if he returned to his home country, he responded, "If I were to return to Yugoslavia, I would be arrested and detained in jail

---

[2]Neither party seeks review of the BIA's decision not to affirm the Immigration Judge's finding that Lacinaj filed a frivolous application for asylum.

for my political views and opposition to the Serbian government which discriminates and persecutes Albanians who seek the independence of the District of Kosova [sic]." When asked if he or any member of his family ever belonged to any political organizations or groups in his home country, Lacinaj responded only that he belonged to an informal secret organization in Kosovo which advocated independence of Albanians and staged demonstrations against the Serbian government. When asked if he or any member of his family had ever been mistreated or threatened by the authorities of his home country or a group controlled by the government, he responded, "I was arrested in 1991 for taking part in an anti[-]government demonstration and was arrested and detained for two days."

Lacinaj was subsequently interviewed under oath by an asylum officer. During the interview, Lacinaj stated that he was not afraid to return to Albania, but that he did not want to go back because of his family's experiences with the Albanian government. He stated that his father was jailed from 1980-1991 for his criticism of the Albanian government, and that his brother was killed by Albanian border guards in 1982 as he tried to flee the country. Lacinaj indicated that he returned to Albania in 1993 because of the mistreatment of Albanians in Yugoslavia and he wanted to see how Albania had changed. Lacinaj stated that he had no particular problems in Albania but that the family land had been confiscated, his mother was living with his sister and he couldn't find a job. He said that being in Albania was hard because of all the things that happened to his family. The asylum officer found Lacinaj's testimony to be sufficiently detailed and credible. However, he concluded that Lacinaj was not eligible for asylum because (1) the events Lacinaj described did not constitute past persecution, (2) the detention of Lacinaj's father 15 years earlier did not warrant a grant of asylum to Lacinaj based on grounds of past persecution, (3) country conditions had changed

to such an extent that Lacinaj no longer had a well-founded fear of future persecution, and (4) in any event, Lacinaj admitted that the government had done nothing to him personally and he did not fear returning to Albania.

Lacinaj remained in the United States beyond June 1, 1994 without authorization from the former Immigration and Naturalization Service ("INS"). In March 1996, the INS commenced removal proceedings against him. At a hearing in April 1996, Lacinaj admitted the factual allegations against him and conceded deportability. Rather than accepting an order of deportation, he filed a second application for asylum and withholding of deportation which mirrored the same assertions he made in his first asylum application.

At a merits hearing in February 1997, Lacinaj moved to withdraw his second application for asylum and withholding of deportation in exchange for a grant of voluntary departure. After ensuring that Lacinaj understood the consequences of such action,[3] the IJ withdrew Lacinaj's asylum application and granted him up to January 15, 1998 to depart voluntarily – with the warning that if he failed to depart in a timely manner, the grant of voluntary departure would be withdrawn without further notice and an order of deportation to Albania would be entered.

On February 13, 1998, Lacinaj, through new counsel, filed a motion to reopen his deportation proceedings based on ineffective assistance of his first counsel and changed country conditions in Albania. The IJ granted his motion, after which Lacinaj filed a third application for asylum. The third application, which contained assertions materially different from those in the first two applications, alleged the following facts. Lacinaj's brother was murdered in September 1982

---

[3]The IJ informed Lacinaj that, unless conditions changed in Albania in the future, she would not be able to consider reopening his case to allow him to reapply for relief.

"due to political action," and his father was imprisoned in Albania from 1979 to 1991 "due to his democratic views," shortly after which he died. Lacinaj claimed that he was actively involved in "anti-government, anti-Communist" demonstrations in Albania in 1990, was arrested and beaten by police on December 13, 1990 and detained until December 17, 1990. Unlike his previous two asylum applications, Lacinaj now claimed that he fled Albania for Yugoslavia in 1990, that he was imprisoned in a camp organized by Serbian forces and was treated inhumanely along with other inmates for thirty-three months. Lacinaj stated that the Serbian forces released him to the Albanian government in July 1993 but, "[d]ue to my involvement in anti-government activities, I still feared for my life so I fled to the United States." Lacinaj asserted that he would be murdered if he returned to Albania.

In support of his third asylum application, Lacinaj submitted numerous documents including his previous asylum applications and a document entitled "Verification from the District Court of the City of Shkodra attesting to mistreatment of the family members of Mr. Lacinaj in Albania." This last document, which began by reciting that it was prepared at Lacinaj's request, stated among other things that Lacinaj fled Albania for Yugoslavia in 1982, and lived in Yugoslavia for eleven years before returning to Albania.

A merits hearing was held on March 5, 2001. Before presenting testimony in support of his requests for relief, Lacinaj represented to the IJ that he reviewed his application with his attorney, was aware of the contents of his application including all attachments and supplements, and swore and/or affirmed that they were true to the best of his knowledge. Lacinaj and four witness testified in support of his applications for relief.

Lacinaj's testimony was largely consistent with the allegations of his third asylum

5

application. He testified that he left Albania for the United States in 1993 because the Communists had threatened him. When asked who threatened him, he replied that it was the same people who had led the Communist Party for many years and were now members of the Socialist Party. He specifically named Murad Ibrahimi, who was previously the leader of the Communist Party in his village, as one of the individuals who had threatened him. Lacinaj claimed that he moved around every few days after returning to Albania in 1993 out of fear of the Communists making good on their threats. When asked if Ibrahimi ever harmed any of Lacinaj's family members, he replied that Ibrahimi had approved his brother's execution after he was caught attempting to escape to Yugoslavia, and that Ibrahimi was responsible for the two-year imprisonment of his cousin. Lacinaj testified that he was arrested in Shkoder, Albania on December 13, 1990 after participating in an anti-government demonstration, and that he was abused and detained for four days during which time he was threatened with death if he participated in similar demonstrations again. He fled to Yugoslavia two weeks later, where he promptly surrendered to authorities and was imprisoned for illegal entry. On January 17, 1990, he was sent to a refugee camp in Belgrade where he shared a small room with between sixty and seventy other refugees. After six months, he was moved to a different refugee camp. Serbian police returned him to Albania in July 1993, where he remained until he left for the United States in December 1993. When asked if he joined the Democratic Party upon his return to Albania, he responded that he decided to leave Albania forever after he was threatened by Socialist Party members.

Lacinaj testified that, upon his arrival in the United States, he sought the assistance of an attorney to seek asylum. He claimed that the attorney fabricated part of Lacinaj's initial asylum application and provided him with a script of incorrect information to use when he went for his

6

initial asylum interview. Lacinaj explained that he did not speak English at the time, and that he later became aware that his initial asylum application contained errors when he saw incorrect answers as to his place of birth and citizenship. He testified that his first attorney called him into his office prior to the merits hearing on his second asylum application and recommended that he accept voluntary departure because the judge for his case "doesn't like Albanians at all." Consequently, Lacinaj accepted voluntary departure and was ordered to leave the country by January 15, 1998.

Before the departure date, Lacinaj learned of increasing turmoil in Albania. His sister's husband, a leader in the Democratic Party, was threatened by four masked men who told him they would "pay [their] revenge" against him because he was a member of the Democratic Party. His sister, then pregnant and fearful of increasing dangers, fled to the United States. Her husband fled to the United States shortly thereafter. Fearing for his own safety should he return to Albania, Lacinaj sought the assistance of new counsel and filed a Motion to Reopen, which the IJ granted. This hearing followed.

On cross-examination, Lacinaj admitted that his entire initial asylum application was incorrect. He admitted that he lied under oath at his asylum interview in 1995, but claimed that he testified according to notes prepared by his first attorney. He testified that his attorney "forced" him to lie during his asylum interview, even though his attorney was not present at the interview. Lacinaj admitted that his second asylum application, which nearly mirrored the first, was prepared by the same attorney who allegedly forced him to lie during his asylum interview. When asked why he waited until February 1998 to file a motion to reopen when he learned about the alleged changed country conditions in Albania from his sister six months earlier, he responded that his initial attorney

7

never explained to him that he had a right to reopen his case. He admitted that he never filed a grievance or complaint against his first attorney.

When shown the document from the Shkoder district court purporting to verify the abuse of Lacinaj's family, which document was submitted with his third asylum application, he testified that he had never seen the document before. When it was pointed out that the document stated that it was made at his request, Lacinaj testified that he did not know who had requested it and that he had not. When pressed on this point by the IJ, Lacinaj testified that he first saw the document when his second attorney had asked him what it was while going through the file she obtained from his first attorney. He stated that he did not know how his first attorney obtained the document. He testified that he told his second attorney that some of the information in the document was false; however, he admitted that he submitted the document to the immigration court even though some of the information in it was not true. When asked by counsel for the INS and the IJ when he intended to inform the court that a document submitted in support of his asylum application was false, he responded that he "never paid attention to that document because I didn't bring the document." Lacinaj admitted that his application inaccurately represented his citizenship, his address in Yugoslavia and the history of his life.

Lacinaj called Dr. Bernd Fischer, an expert on country conditions in Albania, to testify on his behalf. Dr. Fischer testified that he last traveled to Albania in May 2000, during which time he visited Lacinaj's home town of Shkoder. He described Shkoder as the least stable of Albania's large towns as a result of the lack of government control, economic problems, and the prevalence of criminal organizations and blood feud violence. He testified that the Democratic Party was very active in Shkoder with a history of resistance to Albanian governments. When asked to give

examples of lack of government control, Dr. Fischer testified that there was a diminished police presence, with officers normally only on the streets a few hours at night, wearing ski masks to hide their identity from anyone seeking retribution. He testified that the Albanian government was attempting to correct the situation by collecting weapons that were looted from government arsenals during the riots of 1997, following the collapse of pyramid schemes. He testified that Democratic Party members claimed that the Socialist Party, which was then in power, was responsible for beating, incarcerating and killing Democratic Party members. He also testified that political parties in Albania were more personal than ideological and were an expansion of the historically endemic "clan structure" of Albania. He stated that the concept of collective responsibility was ingrained in Albanian culture, pursuant to which, if an individual was responsible for an act, then his family was also generally held responsible.

On cross-examination, Dr. Fischer admitted that he had only reviewed Lacinaj's most recent asylum application in preparing for his testimony, that he had not seen Lacinaj's first two applications, that he assumed the information he read in an asylum application was true and that he would not be inclined to testify for an applicant if he found the information to be implausible. When asked if he thought the content of the State Department report on country conditions in Albania was accurate, Dr. Fischer responded that, despite some sloppiness, the report gave a reasonable picture of the situation in Albania today. Dr. Fischer testified that a combination of collective responsibility in northern Albania plus the fact that Lacinaj's brother-in-law was threatened by someone in the Socialist Party left "at least . . . a possibility for [Lacinaj] being harmed." However, setting aside any specific threats, his connection to his brother-in-law "would not in itself be enough to assume that there will be harm."

Lacinaj also called two of his friends as witnesses, Engell Shpati and Mihil Anzi. Shpati testified that he lived in the same town as Lacinaj, and worked with Lacinaj and his brothers. He stated that Lacinaj's grandfather and father had both been imprisoned in Albania, and that his brother was killed by Albanian soldiers as he was attempting to cross the border. Shpati testified that he and Lacinaj crossed the border to Yugoslavia together in January 1991, and that they were detained in a prison in Titograd for twelve days. Shpati stated that they were sent together to a refugee camp in Belgrade, but that because Shpati had a family, he and his family were sent to a hotel in the camp. Six months later, Shpati came to the United States.

On cross-examination, the government attorney confronted Shpati with inconsistencies between his testimony and the affidavit he submitted to the immigration court in support of Lacinaj's asylum application. For instance, in the affidavit, Shpati averred that after Lacinaj was arrested in Titograd, he was sent to the refugee camp in Belgrade where Shpati was living. He also averred that from January 7, 1991 to July 3, 1991, he shared the same quarters with Lacinaj in the refugee camp. In response, Shpati testified that he didn't remember what he wrote in the affidavit but that what he said at the hearing was the truth.[4] On redirect, Shpati indicated that during the six-month period his family was detained in the hotel, he had seen Lacinaj only once or twice when Lacinaj was given a permit to visit Shpati's family at the hotel.

Anzi testified that he met Lacinaj in the refugee camp in Yugoslavia in January 1991, and that he saw Lacinaj every day during his detention until they were returned to Albania in the spring of 1993. He testified that he and Lacinaj were held in a small room with approximately 75 people.

---

[4]There was an additional inconsistency between Shpati's testimony and the averments in his affidavit. In the affidavit, Shpati averred that Lacinaj's brother was arrested at the border, sentenced to death and executed.

He also testified that he and Lacinaj saw Shpati every day at meal times.

Lacinaj's current employer, Matthew Seely, testified that Lacinaj, who had worked for him for several years, came to his office one day and informed him that he had to leave for Albania because he was being deported. Seely testified that Lacinaj, who was a shy person and a hard worker, was extremely upset about the prospect of returning to Albania and that he (Seely) took the unusual step of trying to locate counsel to help Lacinaj. When asked if there was any other time which led him to believe that Lacinaj was fearful of returning to Albania, Seely began to describe a conversation he overheard between Lacinaj's friends at Lacinaj's wedding reception. However, the IJ sustained the government's objection to this testimony on hearsay grounds.

At the conclusion of the hearing, the IJ denied Lacinaj's petition for asylum, withholding of deportation and request for relief under the CAT. She subsequently issued a written opinion explaining her ruling. The IJ found that Lacinaj had failed to present credible testimony in support of his asylum application and had, in fact, provided documents that were deliberately fabricated such that the application was frivolous. In so holding, she noted Lacinaj's admission that he filed two fraudulent asylum applications which he blamed on his first counsel; that he testified falsely before the asylum officer with the alleged help of a cheat sheet provided by his attorney; and that he filed a fraudulent document in support of his third application (the Shkoder verification) which his new attorney filed in support of Lacinaj's third asylum application and which Lacinaj neglected to say was fraudulent until he was cross-examined by the government. The IJ found that the reason given by Lacinaj's second counsel for not filing a complaint against Lacinaj's first attorney (her belief that the first attorney was no longer practicing law) was inadequate, and that it did not explain her failure

11

to notify that attorney of the allegations against him, or her failure to subpoena him as a witness at the hearing. The IJ also found Lacinaj's testimony to be inconsistent both internally and with the testimony of other witnesses.

Even if she had found Lacinaj's testimony credible, the IJ concluded that she would not find that the conditions in Albania had changed to the extent that Lacinaj had a well-founded fear of persecution. She noted that, with respect to the claim that he was threatened by an alleged member of the Socialist Party upon his return, Lacinaj presented no evidence that this individual currently held any position of authority or had the ability to carry out any threat. Moreover, Lacinaj failed to establish that he would be unable to relocate within the country of Albania.

The IJ concluded that Lacinaj misrepresented the basis for his reopening as well as having submitted false testimony and fraudulent documents, that he failed to establish a credible application for asylum, and that his application was frivolous. She also concluded that, because Lacinaj had failed to satisfy his burden of proof for asylum, he failed to establish his eligibility for withholding of deportation and protection under the CAT.

On appeal, the BIA affirmed the IJ's ruling denying asylum, withholding of deportation and relief under the CAT. The BIA reversed the IJ's ruling that Lacinaj's asylum application was frivolous. With respect to Lacinaj's claim that the IJ erred by not allowing his employer to testify about conversations he overheard at Lacinaj's wedding reception, the BIA agreed with the IJ's determination that such testimony would have been unreliable and that Lacinaj could have called his wedding guests as witnesses instead of offering their statements through his employer.

12

**II.**

This court has jurisdiction over decisions of the BIA pursuant to 8 U.S.C. § 1105a(a) as amended by the transitional rules for judicial review in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009-3546 (Sept. 30, 1996).

**III.**

The Attorney General may grant asylum to any person who qualifies as a "refugee;" i.e., "a person who is unable or unwilling to return to his home country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.' " *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (citing *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004), in turn quoting 8 U.S.C. § 1101(a)(42)(A)). Persecution "requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Id.* (quoting *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998)). To show that he has a well-founded fear of future persecution, the petitioner must show that (1) he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) he is unable or unwilling to return to that country because of such fear. *Id.* (citing *Pilica*, 388 F.3d at 950). Applicants who show that they have suffered past persecution are presumed to have a well-founded fear of future persecution. *Id.*; *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003). The government may rebut this presumption by showing, with a preponderance of evidence, that there has been a fundamental change in circumstances such that the petitioner no longer has a well-founded fear of persecution. *Id.*; 8 C.F.R. § 208.13(b)(1)(ii).

The burden of establishing that an applicant qualifies as a "refugee" is on the applicant. *Gilaj, et al. v. Gonzales*, No. 03-4307, __ F.3d __ (6th Cir. May 9, 2005) (recommended for publication) (citing 8 C.F.R. § 1208.13(a)-(b)). "The applicant's testimony, if credible, 'may be sufficient to sustain the burden of proof without corroboration.'" *Id.* (quoting 8 C.F.R. § 1208.13(a)). "Credibility determinations are considered findings of fact, and are reviewed under the substantial evidence standard." *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004)). "Under that standard, findings of fact are treated as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary. '" *Hassan*, 2005 WL 724526, at **3 (citing *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quotation marks omitted).

A request for asylum automatically includes a request for withholding of deportation. 8 C.F.R. § 208.3(b). An applicant requesting withholding of deportation must show that "there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Singh*, 398 F.3d at 401 (quoting *Pilica*, 388 F.3d at 951). An applicant seeking relief under the CAT must show that it is "'more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Id.*, 398 F.3d at 404 (citing *Pilica*, 388 F.3d at 951, in turn quoting 8 C.F.R. § 208.16(c)(2)). The standard for withholding of deportation or relief under the CAT is more difficult to meet than the standard necessary to show asylum. *Hassan v. Gonzalez*, No. 03-4446, ___ F.3d ___, 2005 WL 724526, at **3 (citing *Pilica*, 388 F.3d at 955). Therefore, an applicant unable to show eligibility for asylum will generally be unable to show a clear probability of persecution or a likelihood of torture, as required for withholding of deportation or relief under the CAT. *Id.*

14

## IV.

### A.    Adverse Credibility Finding

The IJ found that Lacinaj was not credible and, consequently, denied his request for asylum, withholding of removal and request for relief under the CAT.  We find that substantial evidence supports the IJ's adverse credibility ruling and does not compel a contrary result for several reasons.

First, Lacinaj admitted that his first two asylum applications were fabricated.  The fabrication was extensive.  In his first two applications, Lacinaj asserted that he moved from Albania to Yugoslavia in 1982 where he lived for ten years, was incarcerated for four days and beaten by police based on his participation in a demonstration opposing the Yugoslavian government's anti-Albanian policies, and from which he sought asylum.  In contrast, Lacinaj claimed in the third asylum application that he did not move to Yugoslavia until 1993, after being detained and beaten for four days by Albanian officials following a anti-government protest in which he participated in Albania.  Lacinaj also admitted that statements he made under oath in his initial asylum interview were false, that he followed a cheat sheet of misinformation provided to him by his first attorney, and that he was "forced" to answer questions falsely by his attorney who did not accompany him to the interview. Lacinaj's willingness to fabric testimony in order to obtain asylum seriously undermined his credibility and provide substantial support for the IJ's adverse credibility determination. *See Laurent v. Ashcroft*, 359 F.3d 59, 65 (1st Cir. 2004) (affirming an IJ's adverse credibility determination where the petitioner originally submitted a fraudulent application and gave false testimony at the initial asylum interview).

Second, Lacinaj submitted a fraudulent document (the Shkoder verification) to the immigration court in support of his third asylum application after swearing that he reviewed the

15

attached documents with his attorney and that they were true to the best of his knowledge, and did not indicate that the document was fraudulent until questioned on cross-examination. J.A. 267-68, 282. Submission of this fraudulent document, alone, provided substantial support for the IJ's finding that Lacinaj was not credible. *See Gjinaj v. Ashcroft*, No. 03-3560 2005 WL 54730 (6th Cir. Jan. 6, 2005) (unpublished).

Third, the testimony of Lacinaj's witnesses was insufficient to corroborate Lacinaj's testimony and application. Shpati's testimony was inconsistent with his own affidavit and with Anzi's testimony, implicating the credibility of both witnesses and failing to corroborate Lacinaj's latest version of the facts.[5] Lacinaj's employer offered little more than testimony regarding Lacinaj's fear of returning to Albania. Lacinaj's expert witness provided mostly general testimony regarding conditions in Albania. His testimony did not differ significantly from the State Department country reports for Albania, the most recent of which indicated that the problems Albania faced stemmed mainly from poverty, unemployment and a devastated economy, and that retribution against former opponents of the Communist regime were more in the nature of blood feuds than politics. Dr. Fischer's testimony did not support Lacinaj's claim of a well-founded fear of future persecution based on his sister's marriage to a prominent member of the Democratic Party because he also testified that her marriage broke the ties to her family and, implicitly, to her brother.

Lacinaj advances several arguments to support his claim that the record compels reversal of the IJ's adverse credibility determination. First, he argues that the fact that he admitted that his prior submissions were fraudulent compels a finding of credibility in this case. This argument is

---

[5]Anzi testified that he and Lacinaj saw Shpati every day during mealtimes in the refugee camp, and Shpati testified that he only saw Lacinaj once or twice after they were separated.

unpersuasive. Lacinaj's admission that he lied previously does not make his new testimony more credible. There are many possible reasons an applicant might admit that he submitted prior false testimony other than as part of an effort to be truthful. For example, Lacinaj may have realized that his first story lacked corroboration and decided to alter the story to mirror the testimony of his witnesses. Regardless of the motivation for Lacinaj's actions, his admission that his prior submission was a fabrication supports the IJ's adverse credibility determination.

Next, Lacinaj argues that the IJ's credibility determination was erroneous because the BIA's reversal of the IJ's finding that his petition was frivolous meant that the BIA necessarily found that Petitioner was truthful when he stated that he did not deliberately fabricate his asylum application. This argument also lacks merit. The BIA, in refusing to affirm the IJ's finding of frivolousness, explicitly stated, "[W]e refrain from finding that material aspects of his claim were deliberately fabricated." J.A. 5. This holding does not mean that Lacinaj was truthful in his application, only that there was insufficient evidence to show that he intentionally submitted a fraudulent document. This holding also does not affect Lacinaj's past fraudulent testimony. As a result, even assuming that the BIA's ruling meant that Lacinaj was truthful when he testified that he did not intentionally fabricate the document submitted with his application, the holding would not compel a finding that Lacinaj was credible during the hearing because there were other reasons to doubt Lacinaj's credibility.

Finally, Lacinaj argues that he lied in his initial application because his first lawyer "forced" him to do so. Whether or not this is true, it does not compel reversal of the IJ's adverse credibility determination. There is no question that Lacinaj testified to a hearing officer, without his lawyer present, to the false facts contained in each of these applications. Regardless of the role of Lacinaj's

17

first lawyer, Lacinaj's willingness to submit two false applications and testify to admittedly false information supports the IJ's adverse credibility finding.

Viewing the record as a whole, there is substantial support in the record for the IJ's finding that Lacinaj was not credible. Lacinaj submitted fraudulent information on his first two asylum applications and lied to the immigration officer. He also submitted a fraudulent document in support of his third asylum application after swearing that the attached documents were truthful. And he failed to produce credible witnesses to corroborate his latest version of the facts. Accordingly, the evidence does not compel a contrary conclusion. Because Lacinaj was unable to show that he suffered from past persecution or had a well-founded fear of future persecution, he was unable to show that he was entitled to asylum, withholding of deportation or relief under the CAT.

## B. Due Process

Lacinaj also contends that the IJ deprived him of due process of law by refusing to allow his employer to testify about a conversation he overheard at Lacinaj's wedding and by "articulating prejudice throughout the hearing." *Petitioner's Br.,* at 27. The Fifth Amendment guarantees immigration defendants a full and fair hearing. *Ali v. Ashcroft*, 366 F.3d 407, 412 (6th Cir. 2004); *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001). However, immigration judges have broad discretion in conducting their hearings. *Ahmed. v. Gonzales*, 398 F.3d 722, 724 (6th Cir. 2005) (citing *Mikhailevitch*, 146 F.3d at 391). "[M]ere intimidation or interruption by a judge does not render a hearing unfair." *Id*. (citations omitted); *see also Ivezaj v. INS*, 84 F.3d 215, 220 (6th Cir. 1996) (holding that aliens do not have a "right not to have their feelings hurt by a 'no nonsense' [immigration judge]"); *cf. Liteky v. United States*, 510 U.S. 540, 555-56 (1994) (holding that "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds

18

of what imperfect men and women, even after having been confirmed as federal judges, sometimes display," do not establish bias or partiality). Thus, an alien is entitled to a full and fair hearing, not a perfect one. *Laurent v. Ashcroft*, 359 F.3d 59, 62 (1ˢᵗ Cir. 2004). Allegations of due process violations based on the conduct of an immigration judge are reviewed *de novo*. *Mikhailevitch*, 146 F.3d at 391.

After reviewing the record, we conclude that the IJ's actions in this case did not violate Lacinaj's right to a full and fair hearing. Although the Federal Rules of Evidence do not apply to immigration hearings, *Singh v. Ashcroft*, No. 03-3546, 2005 WL 291515, at *9 (6ᵗʰ Cir. Feb. 8, 2005), they can provide guidance as to the types of evidence that may be less reliable and, therefore, properly excluded without violating due process. The testimony that Lacinaj's employer was about to give related to a conversation he had overheard between third parties at a wedding. Because the employer did not have firsthand knowledge of the information he was about to relate to the court, his testimony in this regard was unreliable. *Cf*. Fed. R Evid. 801, 802. Thus, the IJ's exclusion of this testimony did not violate due process.

Even if the IJ's refusal to allow the testimony was error, there is no evidence that it caused prejudice to Lacinaj, who was free to call the wedding guests as witnesses at his hearing. If he had done so, the IJ would have had the benefit of this testimony which Lacinaj claims he was unfairly denied. Thus, it was Lacinaj's own failure to call these witnesses that caused the alleged prejudice, if any.

Lacinaj also argues that the IJ "prejudiced the outcome of the hearing by basically failing to consider anything Petitioner said after he had admitted the false statements in his first asylum application and in his administrative asylum hearing." *Petitioner's Br*. at 29. However, the IJ had

no obligation to assume the credibility of Lacinaj just because he admitted having filed two false asylum applications and having testified falsely before the asylum officer. This is particularly so in light of the fact that he testified it was his first attorney's fault that he did all this, and he never filed a bar grievance, gave that attorney an opportunity to respond to these serious allegations or subpoenaed the attorney to testify at his hearing. Moreover, the record shows that Lacinaj filed a fraudulent document in support of his third asylum application, swore that all the documents attached to this asylum application were true to the best of his knowledge, then failed to mention that this document was fraudulently procured until it was pointed out to him on cross-examination.

Finally, Lacinaj offers absolutely no support for his assertion that he was "denied the opportunity to present extensive evidence that he possesses a well-founded fear of future persecution." *Id.* With the sole exception of the limiting of his employer's testimony, Lacinaj has failed to identify any other evidence that he was prevented from presenting at the hearing. We would also point out that the IJ's written decision in this case was particularly articulate, thorough and well-considered. Under the circumstances, we conclude that Lacinaj's due process challenge lacks merit.

## V.

Based on the foregoing, we **AFFIRM** the BIA's decision and **DENY** the Petitioner's request for review.