**Not For Publication in West's Federal Reporter**
**Citation Limited Pursuant to 1st Cir. Loc. R. 32.3**

# United States Court of Appeals
## For the First Circuit

No. 05-1531

WEN CAO AND ZHI FANG WANG,
Petitioners,

v.

ALBERTO R. GONZALES,* ATTORNEY GENERAL,
Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Selya, Circuit Judge,
Coffin and Cyr, Senior Circuit Judges.

Gary J. Yerman on brief for petitioners.
Peter D. Keisler, Assistant Attorney General, Civil Division,
Linda S. Wernery, Senior Litigation Counsel, Office of Immigration
Litigation, and Sarah Maloney, Attorney, United States Department
of Justice, on brief for respondent.

October 14, 2005

---

*Alberto R. Gonzales was sworn in as United States Attorney General
on February 3, 2005. We have therefore substituted Attorney
General Gonzales for his predecessor in office as respondent in
this matter. See Fed. R. App. P. 43(c)(2).

**SELYA**, **Circuit Judge**.  The petitioners, Wen Cao and Zhi Fang Wang, are citizens of the People's Republic of China.  They seek judicial review of a final order of the Board of Immigration Appeals (BIA) denying their applications for asylum and withholding of removal.  The petitioners assert that the BIA erred in affirming a decision of an Immigration Judge (IJ) holding that they had failed to carry their burden of showing a well-founded fear of persecution should they return to China.  Concluding, as we do, that substantial evidence supports the IJ's adverse credibility determination and, hence, the decision, we deny the petition.

The petitioners hail from Fujian province.  They claim to have been married under "customary law" in 1990.[1]  They resorted to this form of marriage, they explain, because they were both underage and local officials had denied their application to marry legally.

Cao emigrated to the United States in February 1992.  He used a fake passport, but the authorities discovered the artifice during his attempt to enter.  The Immigration and Naturalization Service (INS) questioned him under oath.  He told the INS inspector that he was unmarried and that he had come to the United States in search of freedom and a better life.

---

[1]By marriage under "customary law," the petitioners apparently mean that they were united in a wedding ceremony witnessed by the community.  This form of marriage is not legally recognized in China and, thus, lacks valid documentation.

Cao filed a request for asylum and withholding of deportation on February 14, 1992. In his application, he reiterated that he was not married. This time, however, he claimed that his opposition to the Chinese government's policy relating to individually owned businesses would result in persecution should he return to his native land. He also asserted that he had been arrested in 1991 for trying to escape from China and that both of his sisters had been forcibly sterilized due to their opposition to, and violation of, China's family planning policy.

The INS paroled Cao into the United States pending disposition of his application. In September 1995, he asked for permission to return to China, stating that he wanted to visit his ailing mother. The INS found his supporting documentation fraudulent and denied his request.

Wang entered the United States illegally in December 1995. She married Cao in a civil ceremony in April 1997. The next month Cao submitted a second asylum application and Wang submitted a parallel application. These applications stated that Cao and Wang were seeking asylum because the Chinese government had repeatedly refused their requests for permission to marry, brutally forced Cao's sisters to undergo sterilization and abortion procedures, and harassed Cao in his business pursuits when he refused to pay bribes to government hierarchs.

Unimpressed, the INS instituted removal proceedings against both Cao and Wang. Their removal proceedings and applications for relief were consolidated. In June 1999, Cao and Wang each filed statements in support of their applications. They noted that Wang was pregnant and expressed fear that one or both of them would be forcibly sterilized if they returned to China.[2]

The IJ held an evidentiary hearing on October 31, 2001. Cao testified that he left China because he opposed that country's family planning policy. He claimed that on September 10, 1991, several family planning officials arrived at his house looking for his eldest sister, Qui Jin Cao, who had been hiding from them. When Cao blocked the door and tried to alert his sister, the officials punched him in the nose and knocked him down.

Once they had subdued Cao, the intruders seized Qui Jin and took her away. Because they threatened to return to "take care" of him, Cao went to his grandmother's house to hide. Shortly thereafter he paid a snakehead $30,000 to fabricate exit documentation and smuggle him out of China.[3]

Wang testified more briefly. She said that her fear of living in China began in 1990 when the government refused to allow

---

[2]In contrast to her 1999 asylum statement, Wang did not allege any connection between her pregnancy and her fear of returning to China when she testified before the IJ. See text infra.

[3]The snakeheads are a notorious group whose forte is smuggling persons out of China in return for handsome fees.

her and her new husband (Cao) to register their marriage. She also testified that both her older sister and her neighbor had been subjected to coercive birth control measures. In 1995, her family took out a high-interest loan and paid a snakehead $45,000 to smuggle her out of the country.

The IJ found that both petitioners lacked credibility and, therefore, had not established a well-founded fear of persecution. Consequently, the IJ denied their applications for relief and ordered the petitioners removed to China. The BIA affirmed without opinion. This timely petition for judicial review followed.

When the BIA affirms an IJ's decision without opinion, this court reviews the IJ's decision directly, as if it were the decision of the BIA. Jupiter v. Ashcroft, 396 F.3d 487, 490 (1st Cir. 2005). Thus, we focus on the IJ's findings, reviewing them in accordance with the highly deferential substantial evidence standard. Under that standard, the IJ's findings will be upheld as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). Put another way, the findings must stand "unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

The focal point of this petition is the IJ's adverse credibility determination. The petitioners assert that the IJ

-5-

improperly based this determination on minor inconsistencies and understandable omissions. Relatedly, they assert that the IJ erred in concluding that the petitioners' testimony failed to make out a case for asylum.[4]

To be eligible for asylum, an alien bears the burden of establishing his or her status as a refugee. See id. § 1158(b)(1). The basic definition of a "refugee" is a person who is unwilling or unable to return to their country of nationality due to "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." Id. § 1101(a)(42)(A). In 1996, however, Congress expanded this basic definition so that "a person who has been forced [by government action] to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion . . . ." Id. The same amendment also provided that "a person who has a well founded fear that he or she will be forced to undergo such a procedure or subjected to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of

_____

[4]The law is well established that if a claim for asylum fails, a counterpart claim for withholding of removal also must fail. See Negeya v. Gonzales, 417 F.3d 78, 85 (1st Cir. 2005). Consequently, we discuss here only the petitioners' claims for asylum.

-6-

persecution on account of political opinion." Id. The petitioners seek to bring themselves within the confines of these amendments.

To establish refugee status, an alien must support his or her claim through credible testimony. Settenda v. Ashcroft, 377 F.3d 89, 93 (1st Cir. 2004). Credible testimony, standing alone, may be adequate to sustain the alien's burden of proof. See id. If the proffered testimony is not credible, however, it may be either disregarded or sharply discounted, depending on the circumstances. See, e.g., Laurent v. Ashcroft, 359 F.3d 59, 64 (1st Cir. 2004); see also Aquilar-Solis v. INS, 168 F.3d 565, 570-71 (1st Cir. 1999).

Commensurate with the importance of credibility determinations in immigration cases, an IJ cannot pull such determinations out of thin air. Rather, the IJ must offer a specific and cogent rationale for disbelieving the alien. El Moraghy v. Ashcroft, 331 F.3d 195, 205 (1st Cir. 2003); Gailius v. INS, 147 F.3d 34, 47 (1st Cir. 1998).

In this instance, the IJ found neither petitioner credible. Moreover, she noted several inconsistencies in the petitioners' testimony over the course of the proceedings. These included (i) Cao's repeated assertions, in his initial application and interview, that he was single as contrasted with his later claim of a customary marriage to Wang in 1990; (ii) Cao's statement on his initial application that he had been arrested and threatened

in 1991 as contrasted with his subsequent repudiation of those statements during the evidentiary hearing; and (iii) Cao's use of fraudulent documentation in his effort to obtain permission to visit his ailing mother two months before Wang succeeded in having herself smuggled into the United States (timing that the IJ supportably termed "more than coincidental"). The IJ also found that Cao's use of bogus documentation at multiple points in the immigration process (e.g., his use of a fake passport at the time of his entry and the fictitious "support" that he provided to show his mother's supposed illness) implicated the petitioners' credibility. Finally, the IJ drew a negative inference from the absence of Cao's brother-in-law (Qui Jin's husband); even though the brother-in-law lived in New York at the time of the hearing, he did not testify — and Cao gave no indication as to why.

The petitioners only attempt to resolve one of the above-mentioned inconsistencies. They argue that the discrepancy between their customary marriage in 1990 and Cao's failure to reveal that marriage in 1992 is not only unimportant but also easily explained by Cao's confusion over the legality of the marriage. The first part of this argument is wishful thinking; given what the petitioners now say was their main reason for leaving China, we do not think that Cao's misrepresentation of his marital status sensibly can be viewed as unimportant. The second part of the argument — that Cao was confused — is possible, but that

explanation was, within wide limits, for the IJ to assess. See Laurent, 359 F.3d at 64 (explaining that evaluation of a witness's veracity is a central part of the IJ's job). The IJ evidently rejected the explanation and we are not at liberty to second-guess her finding.

In all events, the petitioners do not challenge the other specific instances of less-than-forthright testimony cited by the IJ. Nor do they satisfactorily explain the shifting bases offered by Cao in support of his multiple asylum applications.[5] To cinch matters, the veracity of both Cao's and Wang's testimony is clouded by the United States Department of State's report entitled China: Profile of Asylum Claims and Country Conditions (1998) (the Country Conditions Report). The Country Conditions Report indicates that most emigrants from Fujian province are motivated by economic concerns as opposed to persecution. Cao, by his own admission, was having trouble keeping his jewelry processing business afloat and both he and Wang paid exorbitant fees to snakeheads to be smuggled into the United States.[6] Against this backdrop, the IJ's finding

---

[5]Both Wang's 1999 asylum application statements and her testimony at the evidentiary hearing are unhelpful in clarifying this point. Basically, they reiterate Cao's statements. The two new details that Wang adds to the story — the supposed sterilization of her sister and her neighbor — were entirely uncorroborated.

[6]Not coincidentally, the Country Conditions Report reveals that Cao's tale regarding his struggle with family planning officials to protect his sister is commonly used by unmarried couples from Fujian province who apply for asylum.

that the couple had — and yielded to — a strong economic incentive to invent a narrative that might allow them to remain in this country, seems unimpugnable.

On this record, we find the IJ's reasons in support of her adverse credibility determination to be both specific and cogent. We therefore uphold the adverse credibility determination.

That determination disposes of the petitioners' second argument: that their testimony compels a finding of a well-founded fear of future persecution. The only evidence in the record that might support a well-founded fear of future persecution is the petitioners' testimony. That can be disregarded because, as we have explained, the IJ supportably determined that the petitioners lacked credibility. Accordingly, the petitioners have failed to establish a well-founded fear of future persecution.

We need go no further. For the reasons elucidated above, the petition for review must be denied.

**So Ordered**.