**Martin SEGRAN, Petitioner,**

v.

**Michael B. MUKASEY, Attorney General,\* Respondent.**

No. 07–1295.

United States Court of Appeals, First Circuit.

Submitted Sept. 28, 2007.

Decided Nov. 27, 2007.

\* Pursuant to Fed. R.App. P. 43(c)(2), Attorney General Michael B. Mukasey has been substi-tuted for former Attorney General Alberto R. Gonzales as the respondent herein.

Robert M. Warren on brief for petitioner.

Peter D. Keisler, Assistant Attorney General, Civil Division, Stephen J. Flynn, Senior Litigation Counsel, Office of Immigration Litigation, and Thomas B. Fatouros, Attorney, Office of Immigration Litigation, on brief for respondent.

Before TORRUELLA, Circuit Judge, SELYA and CYR, Senior Circuit Judges.

SELYA, Senior Circuit Judge.

The petitioner, Martin Segran, is a Liberian national. He sought asylum, withholding of removal, and protection under the Convention Against Torture (CAT). An immigration judge (IJ) found his testimony lacking in credibility, determined that he had not carried his burden of proof, and ordered his removal. The Board of Immigration Appeals (BIA) affirmed. This petition for judicial review followed. Discerning no error, we deny the petition.

The facts are relatively uncomplicated. The petitioner entered the United States on or about October 9, 2000 as a nonimmigrant visitor with authorization to remain for a period ending on April 8, 2001. During the currency of that period, he filed an application for asylum on the ground that he faced persecution in Liberia because of both his membership in the Gio tribe and his refusal to carry out assassination orders.

An asylum officer conducted a "credible fear" interview, found the petitioner's account incredible, and recommended rejection of his asylum application. In due course, federal authorities issued a notice to appear, charging the petitioner with removability under section 237(a)(1)(B) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1227(a)(1)(B), as an alien who had remained in the United States longer than permitted.

The IJ convened a hearing on June 28, 2005. The petitioner conceded removability but cross-applied for asylum under INA § 208(a), 8 U.S.C. § 1158(a), withholding of removal under INA § 241(b)(3)(A), 8 U.S.C. § 1231(b)(3)(A), and relief under the CAT. Following completion of the hearing, the IJ concluded that the petitioner had failed to show any past persecution. The IJ likewise concluded that the petitioner had failed to satisfy his burden of proving either that he had a well-founded fear of future persecution or that there

was a clear likelihood that he would be subjected to persecution or torture should he be returned to Liberia.

These rulings rested squarely on an adverse credibility determination. In making that determination, the IJ pointed to major inconsistencies in the petitioner's various accounts of what had transpired and numerous other discrepancies in his tale. We summarize the most salient of these asymmetries.

In testifying before the IJ, the petitioner stated that, in 1996, he and one of his brothers were going to visit their grandparents when they were stopped by members of the special security services (SSS), a force loyal to former Liberian leader Charles Taylor. The SSS detachment demanded that the petitioner and his brother join their ranks. When the petitioner's brother demurred, the militiamen killed him. Fearing for his life, the petitioner agreed to enlist and soldiered on with the SSS.

This testimony was at odds with the petitioner's earlier recital to the asylum officer during his credible fear interview. Then, he related that he was on his way home, alone, at the moment of his recruitment into the SSS. No mention was made either of his brother or of his grandparents, and no mention was made of a cold-blooded murder taking place before his eyes.

The petitioner also testified that while soldiering for the SSS, he received a bullet wound and was hospitalized for four months. His claims, as expressed to the asylum officer and in his asylum application, were considerably more modest; in both instances, he alluded to a wound but asserted variously that he was hospitalized for "two weeks" or "three weeks."

Next, the petitioner testified before the IJ that, after being discharged from the hospital, he was ordered on two occasions to murder persons opposed to Taylor's hegemony. Both of these requests occurred in October of 2000. When he refused to comply, he was arrested, detained for four or five days, and beaten. Once he escaped, he realized that it was no longer safe for him to remain in Liberia. That realization prompted his departure from his homeland.

The IJ found this chronology suspect. There was good reason for this skepticism. The petitioner's visa to visit the United States had been issued in August of 2000—two full months before the supposed defiance of authority for which he was jailed. Moreover, when the IJ questioned the petitioner about this apparent discrepancy, the petitioner reversed his field. He stated that he had sought to leave Liberia because, without regard to any events that occurred after August of 2002, he thought "it was not safe."

Besides these major cracks in the facade of the petitioner's narrative, other inconsistences were in evidence. First, the petitioner's visa application stated that the purpose of his planned visit to the United States was to attend his mother's funeral. Yet on cross-examination, the petitioner admitted that his mother had not died. Second, when questioned anent his marriage and the births of his children, the petitioner claimed not to recall several significant dates. Third, the petitioner's name was misspelled on several documents that he introduced, and there were varying accounts as to what educational level he had attained. Without exception, the petitioner attributed these multitudinous discrepancies to the individuals who had prepared the relevant documents. The IJ evidently did not believe that explanation.

Dismayed by the IJ's order of removal and the concomitant denial of his cross-application for various forms of relief, the

petitioner took an administrative appeal to the BIA. The appeal proved unavailing: the BIA's decision upheld, and relied upon, the adverse credibility determination and affirmed the IJ's orders. This timely petition for judicial review ensued.

 We review factfinding in immigration proceedings under the familiar substantial evidence rubric. *Pan v. Gonzales*, 489 F.3d 80, 84–85 (1st Cir.2007). This standard requires us to accept the agency's findings of fact, including credibility findings, as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Unless the evidence "points unerringly in the opposite direction," that is, unless it compels a contrary conclusion, the findings must be upheld. *Laurent v. Ashcroft*, 359 F.3d 59, 64 (1st Cir.2004). The agency's responses to abstract legal questions and its application of the law are matters that invite de novo review, with deference accorded to its reasonable interpretation of statutes and regulations falling within its bailiwick. *See Pan*, 489 F.3d at 85; *see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

 We commence the substantive aspect of our appellate review with the petitioner's asylum claim. In order to qualify for asylum, an alien bears the burden of establishing that he is a "refugee" within the meaning of INA § 101(a)(42), 8 U.S.C. § 1101(a)(42). To carry this burden, the alien must show that, should he be returned to his homeland, he would face the prospect of persecution on account of one of five enumerated grounds, namely, race, religion, nationality, membership in a particular social group, or political opinion. *See id.;* 8 C.F.R. § 208.16(b)(2); *see also*

*Pan*, 489 F.3d at 86. To make that showing, an asylum-seeker must demonstrate a well-founded fear of future persecution on account of a protected ground—a fear predicated upon a "reasonable possibility" that such persecution will occur. *Makhoul v. Ashcroft*, 387 F.3d 75, 80–81 (1st Cir. 2004).

 An alien's credible testimony may suffice to sustain his burden of proof even without corroboration. *Pan*, 489 F.3d at 86. However, when the agency supportably determines that an alien's testimony is mendacious, that determination strips the testimony of probative force and permits the agency to disregard or discount it. *See id.; Nikijuluw v. Gonzales*, 427 F.3d 115, 121 (1st Cir.2005). It follows that an adverse credibility determination may doom an alien's claim for asylum or other relief. *Pan*, 489 F.3d at 86; *Stroni v. Gonzales*, 454 F.3d 82, 89 (1st Cir.2006).

 Of course, not every adverse credibility determination merits judicial allegiance. Despite the deferential standard of review that obtains—substantial evidence—an inquiring court's role is not reduced to that of a rubber stamp. To be supportable, an adverse credibility determination must be accompanied by particularized findings, expressly articulated or easily inferable from context, sufficient to cloak it with persuasive force. *See Nikijuluw*, 427 F.3d at 121 (explaining that "an IJ must offer a specific and cogent rationale for disbelieving the alien"); *El Moraghy v. Ashcroft*, 331 F.3d 195, 205 (1st Cir.2003) (noting that appellate deference on credibility assessments in immigration cases "is expressly conditioned on support in the record, as evidenced by specific findings"). What is more, an adverse credibility determination cannot depend on trivia but, rather, must implicate matters of consequence. *Pan*, 489 F.3d at 86; *Boj-*

*orques–Villanueva v. INS*, 194 F.3d 14, 16 (1st Cir.1999).

■ Viewed against this backdrop, the question in this case reduces to whether the petitioner has shown that the adverse credibility determination is not backed by substantial evidence. *See Pan*, 489 F.3d at 85; *Laurent*, 359 F.3d at 64. To prevail, the petitioner must persuade us that "the record evidence would compel a reasonable factfinder to make a contrary determination." *Aguilar–Solis v. INS*, 168 F.3d 565, 569 (1st Cir.1999). This is a heavy burden, and the petitioner has not carried it here.

Before us, the petitioner's principal plaint is that the agency undervalued both his testimony and the on-the-ground realities of life in Liberia. In support of this thesis, he asserts that he was consistent in his testimony about his brother's murder and convincingly explained why his refusal to kill persons opposed to Taylor's leadership put him on extremely dangerous footing and caused him to flee.

■ This attack is easily repulsed. As we have said, it is not enough for an alien faced with an adverse credibility determination to show that the record evidence, viewed favorably to him, would support an opposite determination; rather, he must show that the record evidence *compels* reversal of the adverse determination. *See Elias–Zacarias*, 502 U.S. at 481 n. 1, 112 S.Ct. 812; *Aguilar–Solis*, 168 F.3d at 569. The evidence here falls well short of that benchmark.

By the same token, the petitioner cannot slough off the agency's adverse credibility determination either as purely conclusory or as an unfounded exaltation of trivial errors. In this case, the determination was particularized, record-noted, and closely reasoned. Contrary to the petitioner's importunings, it was not based exclusively on minor discrepancies but, rather, was based largely on major inconsistencies bearing upon the central issue in the case: whether the petitioner fled from Liberia because he reasonably feared persecution or torture on account of a protected ground. Among other things, the petitioner equivocated as to the circumstances in which he was recruited into Taylor's paramilitary cadre, his brother's role in that recruitment, the length of his hospital stay (and, by implication, the severity of the wound that he had sustained during his alleged service with the SSS), and his proximate reason for leaving Liberia.

In an attempt to parry this thrust, the petitioner declares that he never provided contradictory accounts of how his brother died. That is true as far as it goes, but it does not go very far. Two different versions of a single event can be materially inconsistent without being flatly contradictory. So it is here: telling the asylum officer that he was alone and headed for home not only contradicted his later testimony in those respects but also, by omission, called into legitimate question his subsequent claim that his brother had been slain in cold blood as he stood and watched. It beggars credulity that so momentous an event—if it occurred—would have been inadvertently omitted from the petitioner's original account.

Thus, while scriveners' errors and bureaucratic bungling might explain some of the lesser inconsistencies mentioned by the IJ, the major inconsistencies are enough to bulwark the adverse credibility determination. *See, e.g., Pan*, 489 F.3d at 86. This is especially true since the petitioner has pointed to nothing in the record that suggests, much less compels, a finding that these flaws are illusory.

■ The petitioner has a fallback position. He asserts that, notwithstanding the adverse credibility determination, he

presented strong proof of feared persecution arising out of his membership in the Gio tribe. But this claim, like his primary claim, depends on his veracity. Where, as here, the agency has made a supportable finding adverse to an alien's credibility, that finding by itself can sustain a conclusion that the alien has not proved a well-founded fear of persecution. *See id.; Olujoke v. Gonzales,* 411 F.3d 16, 22 (1st Cir. 2005). Though life in Liberia is not free from danger, the bits and pieces of evidence that remain in the record after distilling out the petitioner's testimony are simply not enough to undermine the agency's burden-of-proof determination.

In a somewhat related vein, the petitioner alleges that the IJ and the BIA misapplied the "reasonable person" standard articulated in *Matter of Mogharrabi,* 19 I. & N. Dec. 439 (BIA 1987). He suggests that the BIA had an obligation to explain in its decision why a reasonable person in the petitioner's shoes would not fear persecution. This suggestion overlooks, however, that the IJ explicitly based the denial of asylum on the adverse credibility determination. Once the BIA affirmed that determination, anything more would have been supererogatory.

The claim for withholding of removal need not detain us. To prevail on such a claim, an alien has the burden of proving that it is more likely than not that his life or freedom will be threatened on account of one of the five protected grounds were he to be repatriated. *See* 8 U.S.C. § 1101(a)(42); *see also Pan,* 489 F.3d at 85–86. Because proving eligibility for withholding of removal is similar to, but more demanding than, proving eligibility for asylum, an alien who cannot establish eligibility for asylum a fortiori cannot establish eligibility for withholding of removal on the same facts. *See Makhoul,* 387 F.3d at 82; *Ipina v. INS,* 868 F.2d 511, 515 (1st Cir.1989). Accordingly, the petitioner's withholding of removal claim necessarily fails.

The final issue in this case— the CAT claim—is child's play.[2] In order to establish eligibility for protection under the CAT, an alien must prove a likelihood that he will be tortured if returned to his homeland. *See Stroni,* 454 F.3d at 89–90. Stripping the petitioner's (incredible) testimony out of the mix, there is no way that a reasonable adjudicator could find an entitlement to relief under the CAT. If there is any hint of torture here, that hint is purged by the adverse credibility determination.

We need go no further. For the reasons elucidated above, we deny the petition for judicial review.

***So Ordered.***

---

2. Indeed, the petitioner has offered nothing in the way of fleshed-out or developed argumentation on this point. We could, therefore, reject the CAT claim on that basis alone. *See Pan,* 489 F.3d at 86; *see also United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.1990).