# United States Court of Appeals
## For the First Circuit

No. 08-1789

YING JIN LIN,

Petitioner,

v.

ERIC H. HOLDER, JR.[*], Attorney General,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, John R. Gibson,[**] and Howard,
<u>Circuit Judges</u>.

<u>Joshua E. Bardavid</u> for petitioner.
<u>Gregory G. Katsas</u>, Assistant Attorney General, Civil
Division, <u>Greg D. Mack</u>, Senior Litigation Counsel and <u>Corey L.
Farrell</u>, Attorney, Office of Immigration Litigation, United
States Department of Justice, on brief for respondent.

March 30, 2009

[*]Pursuant to Fed. R. App. P. 43(c)(2), Eric H. Holder, Jr. is
automatically substituted for former Attorney General Michael B.
Mukasey as the respondent herein.

[**]Of the Eighth Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**.  The petitioner, Ying Jin Lin, a native and citizen of the People's Republic of China ("China"), seeks review of a Board of Immigration Appeals ("BIA") final order upholding an Immigration Judge's ("IJ") denial of her applications for asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT").  Discerning substantial evidence in the record in support of the BIA's order, we deny her petition for review.

## I. Background

Petitioner Lin was born October 11, 1981, in the Fujian Province of China.  She arrived at Los Angeles International Airport in July 2001, lacking valid entry documents.  Accordingly, she was detained and a few days later the INS issued a Notice to Appear charging Lin with removability pursuant to Immigration and Nationality Act ("INA") § 212(a)(7)(A)(i)(I), 8 U.S.C. § 1182(7)(A)(i)(I).  At a hearing in April 2003, Lin conceded removability as charged.  She subsequently applied for asylum and withholding of removal, and her application was also treated as a request for withholding of removal based on the United Nations Convention Against Torture ("CAT").

Including Lin's testimony at a hearing before the IJ in February 2005, she has had four occasions to explain the basis for her asylum application.  Initially, she delivered a sworn statement, through a Mandarin interpreter, to an immigration

officer at the airport in Los Angeles. In this statement, Lin said that she had "made the mistake of attending a meeting," and was "taken into custody on suspicion of" membership in Falun Gong. While in custody, she was "beaten up and narrowly escaped being violated." Lin also indicated that she, along with the others who had been arrested, was "bailed out with the advice that each of us is fined 40,000 Renminbi (about $5,000) or be arrested and jailed again." The statement concludes, "I could not afford the fine so I escaped."

Two days after her initial interview, Lin was referred to an asylum officer for a credible fear interview. That interview, again conducted with the aid of an interpreter, was summarized on a hand-written form. It reads, in relevant part:

> The Applicant was standing in front of a friend's house with 10-12 other school friends after a party. Applicant stated that as they talked, suddenly police appeared accusing the group of practitioners of [sic] Falun Gong. . . . The group was beaten, hand-cuffed, taken to the police station and detained for 10 days, where they suffered further beatings/kicks. Friends bailed the Applicant out & she fled the country.

Based on this interview, the asylum officer determined that Lin had established a credible fear of persecution, and she was allowed to remain in the country pending a hearing before an IJ.

Lin's Application for Asylum and Withholding of Removal, submitted under oath in February 2005, was based on political opinion and membership in a particular social group. Lin claimed

-3-

that "The Chinese Government falsely accused me of being a member of Falun Gong." She explained that one night as she and her friends were drinking and loudly "partying" in a private room inside a club, "a policeman suddenly kicked open the door to room [sic] we were in." The police yelled at Lin and her friends and hit them with batons, and Lin "fled towards the door of the club." As she reached the outside of the club, Lin was "grabbed by an officer who was waiting" there, "handcuffed," and taken to the police station. Upon arrival at the station, Lin was informed that she had been arrested due to participation in Falun Gong, which she denied continuously during the ten days she was detained. Her captors gave her little food and beat her when she refused to confess to involvement with Falun Gong. Lin "was eventually released . . . with the help of a family friend." As Lin described it, this contact of her father's "interceded on [her] behalf and secured [her] release."

Lin was the only witness who testified at her subsequent hearing before the IJ. She testified that she was arrested "in a bar," and that she was arrested "[b]ecause we were kind of high in that bar with a lot of our friends and we drank a lot and we sing and we dance." In response to a subsequent question, she added that she had been arrested "[b]ecause they accused me of being Falun Gong practitioner, they accused me of practicing Falun Gong." She and her friends -- a mix of co-workers and classmates -- had

-4-

gathered at the bar for "a party." When asked why the government might suspect her of involvement with Falun Gong, Lin said "they felt I was under age drinking in a bar and I was a little high in the bar and with a disorderly conduct."

On cross-examination, Lin repeatedly disputed the accuracy of her credible fear interview, and claimed she had never said she was "outside a house in front of a street" when she was arrested. Instead, she claimed she was in a room in a karaoke bar. She explained that the arrest took place "close to a friend of mine's house."

Lin was also questioned about the circumstances of her release from jail. She testified that "[m]y father bailed me out through his friends." She indicated that her father borrowed the funds to make the payment for her release, which amounted to 40,000 to 50,000 Renminbi, and later referred to a particular "person . . . my father went through with the money and got me out of the detention center . . . ." On re-direct, Lin testified that the payment "was a bribe."

The IJ questioned Lin directly regarding the details of her incarceration. She testified that "they beat me almost every day, every time they don't . . . like my answer . . . ." After her release, Lin called on a doctor to attend to her injuries, which included bruises, swelling, and scabs from where the beatings had broken her skin. The doctor gave her "some medicine" and applied

"seven or eight" bandages to her wounds.  Lin could not attest to any similar treatment of her classmates or coworkers, because she never saw them during her detention and never spoke with them again.

Although initially the IJ said he thought Lin testified "very well," after taking the case under advisement he issued an oral decision discussing "inconsistencies and implausibilities with respect to the material aspects of her asylum claim."  The IJ accordingly ruled that her testimony was not credible and consequently that her applications would be rejected.  Lin timely appealed the IJ's ruling to the BIA, which dismissed her appeal.[1] This petition followed.

## II. Discussion

We begin our analysis with the petitioner's asylum claim. To qualify for asylum, an applicant must establish that she has "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42)(A); Bebri v. Mukasey, 545 F.3d 47, 50 (1st Cir. 2008).  The applicant's own testimony, if credible, can on its own be sufficient to meet this burden.  Segran

---

[1] The BIA also rejected Lin's argument "that she should be granted asylum because she has married in the United States and given birth to two children here, and thus fears persecution for having violated China's birth planning laws."  Lin has waived this issue by failing to assert it in her opening brief.  See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. West Lake Academy, 548 F.3d 8, 23 (1st Cir. 2008).

v. Mukasey, 511 F.3d 1, 5 (1st Cir. 2007); 8 C.F.R. § 1208.13(a). If, however, the IJ deems the testimony spurious, it may be discounted or completely disregarded. Segran, 511 F.3d at 5; Nikijuluw v. Gonzales, 427 F.3d 115, 121 (1st Cir. 2005). Thus, "'an adverse credibility determination can prove fatal' to an asylum claim." Bebri, 545 F.3d at 50 (quoting Pan v. Gonzales, 489 F.3d 80, 86 (1st Cir. 2007)); Yosd v. Mukasey, 514 F.3d 74, 80 (1st Cir. 2008). In the event that an applicant is found not to be entirely credible in her testimony, corroborating evidence may be used to bolster her credibility. Dhima v. Gonzales, 416 F.3d 92, 95 (1st Cir. 2005).

In making a finding of adverse credibility, an "IJ must provide a 'specific, cogent, and supportable explanation for rejecting an alien's testimony.'" Abdelmalek v. Mukasey, 540 F.3d 19, 22-23 (1st Cir. 2008) (quoting Teng v. Mukasey, 516 F.3d 12, 16 (1st Cir. 2008)). For cases arising prior to implementation of the Real ID Act of 2005, we have applied a "heart of the matter" standard, under which "discrepancies relied upon in making adverse credibility determinations must 'pertain to facts central to the merits of the alien's claims, not merely to peripheral or trivial matters.'" Bebri, 545 F.3d at 50 (quoting Zheng v. Gonzales, 464 F.3d 60, 63 (1st Cir. 2006)); Bojorquez-Villanueva v. INS, 194 F.3d 14, 16 (1st Cir. 1999). The Real ID Act does away with this rule for asylum claims filed after May 11, 2005, but the rule is

applicable to Lin's case, which commenced with her February 10, 2005 applications. Bebri, 545 F.3d at 50 n.1; Lutaaya, 535 F.3d at 70 n.8; Yosd, 514 F.3d at 80 n.6; Castaneda-Castillo v. Gonzales, 488 F.3d 17, 23 n.6 (1st Cir. 2007) (en banc). Thus, we will uphold the adverse credibility finding in this case if (1) the discrepancies and omissions underlying the determination are actually present in the record; (2) those discrepancies and omissions provide specific and cogent reasons to conclude that the petitioner's testimony was incredible with regard to facts central to the merits of her asylum claim; and (3) the petitioner has failed to provide a convincing explanation for the discrepancies and omissions. Zeru v. Gonzales, 503 F.3d 59, 69-70 (1st Cir. 2007); Hoxha, 446 F.3d 210, 214 (1st Cir. 2006).

Here, the IJ concluded that "inconsistencies and implausibilities" rendered Lin's testimony incredible, and the BIA dismissed her appeal, finding that the IJ's adverse credibility determination was not clearly erroneous. See Lin v. Mukasey, 521 F.3d 22, 26 & n.1 (1st Cir. 2008) (citations omitted) (noting that the BIA applies the clear error standard of review). "Where, as here, the BIA issues its own opinion without adopting the IJ's findings, we review the BIA's decision and not the IJ's." Khan v. Mukasey, 541 F.3d 55, 57 (1st Cir. 2008) (citations omitted); accord Lin, 521 F.3d at 26. We review the BIA's judgment under the deferential substantial evidence standard, which requires us to

-8-

uphold the ruling unless the record would compel a reasonable adjudicator to reach a contrary determination. Abdelmalek, 540 F.3d at 22; Lin, 521 F.3d at 25; 8 U.S.C. § 1252(b)(4)(B). In other words, a finding of adverse credibility will stand if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Segran, 511 F.3d at 5 (quoting INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). We emphasize that "[o]ur deferential standard of review does not permit us to second-guess the determinations of the IJ or the BIA, if they are supported by substantial evidence in the record." Rashad v. Mukasey, 554 F.3d 1, 6 (1st Cir. 2009) (citing Khan, 549 F.3d at 576).

In dismissing Lin's appeal of the IJ's adverse credibility determination, the BIA identified several concerns with Lin's testimony. First, it noted inconsistencies with respect to Lin's accounts of where the arrest occurred and the circumstances of her release from jail. Next, the BIA found that Lin offered no plausible explanation as to why the Chinese government would have suspected her of involvement in Falun Gong.[2] When asked whether she or her friends were politically active, Lin explained that "I

---

[2] Lin need not prove actual involvement with Falun Gong to support her asylum claim, only that the Chinese government suspected her of such involvement and persecuted her based on this suspicion. Cf. Vasquez v. INS, 177 F.3d 62, 65 (1st Cir. 1999) (indicating that an imputed political belief, even if incorrectly attributed, can provide the basis for persecution under the INA).

-9-

just feel that we were a little high at that time and we loved to have a good time and play around on the beach." When asked if she knew of any reason the government would have to suspect her of participating in Falun Gong, she said "they felt I was under age drinking in the bar and I was a little high in the bar and with a disorderly conduct." Although Lin's testimony provided a clear explanation as to why she might have been arrested,[3] she did not offer a sensible explanation for why the government might suspect her of participation in Falun Gong. Lin's failure to articulate any reason for the asserted suspicion of involvement in Falun Gong, in contrast to her supplying the much more likely reason she was arrested -- her drinking and disorderly conduct at a bar -- provided ample reason to question the credibility of her claim of persecution. See Bebri, 545 F.3d at 52 (explaining that "common sense" may be used to evaluate the credibility of an asylum-seeker's testimony).

In addition to these reasons for upholding the IJ's credibility determination, the BIA also observed that Lin was arrested along with several of her friends, each of whom could have corroborated her testimony, yet Lin claimed to have never attempted to contact any of them after the arrest. Not only did this claim itself call into question the veracity of Lin's account, but also

---

[3] When first asked directly, Lin testified that the only reason for her arrest was that "we were kind of high in that bar with a lot of friends and we drank a lot and we sing and we dance."

-10-

Lin failed to supply any other corroborative evidence to bolster her testimony. Specifically, Lin did not proffer affidavits from her parents, doctor, or witnesses of her arrest, nor did she provide doctor's records, photographs, or any documentation whatsoever of her claimed incarceration and injuries. Although a lack of documentation is "not fatal" to an asylum-applicant's case, it still may weigh against the applicant's credibility. Estrada-Henao v. Gonzales, 453 F.3d 38, 40 (1st Cir. 2006) (per curiam); see Muñoz-Monsalve v. Mukasey, 551 F.3d 1, 8 (1st Cir. 2008) ("[T]he utter lack of corroboration, easily obtainable were the petitioner's tale true, supports the adverse credibility determination." (footnote omitted)); Simo v. Gonzales, 445 F.3d 7, 12 (1st Cir. 2006) (absence of corroborating evidence supported adverse credibility determination).

Ultimately, given the myriad grounds for the BIA's finding of adverse credibility, we cannot find that "any reasonable adjudicator would be compelled to conclude to the contrary" with respect to Lin's asylum claim. See Rashad, 554 F.3d at 7; Pan, 489 F.3d at 85 ("We will embrace a finding unless the evidence 'points unerringly in the opposite direction.'" (quoting Laurent v. Ashcroft, 359 F.3d 59, 64 (1st Cir. 2004))). In the absence of credible testimony, the denial of Lin's asylum application was supported by substantial evidence in the record. See Rivas-Mira v. Holder, No. 08-1604, 2009 WL 323469, at *5 (1st Cir. Feb. 11, 2009)

("Once we accept the adverse credibility determination -- as we must -- the petitioner's case collapses.").

Lin's application for withholding of removal fares no better. Because Lin has failed to establish eligibility for asylum, she necessarily cannot establish eligibility for withholding of removal, which demands a higher showing of proof. Vallejo-Piedrahita v. Mukasey, 524 F.3d 142, 145 (1st Cir. 2008) (citations omitted); Segran, 511 F.3d at 7. Regarding Lin's claim for relief under CAT, nothing in the record compels us to conclude that it is more likely than not that she would be tortured if she were to return to China. See Abdelmalek, 540 F.3d at 24. Again, without credible testimony to support her claims, the denial of Lin's applications for asylum, withholding of removal, and protection under CAT was supported by substantial evidence, and the petition for review is **DENIED**.