Sovannary SENG, Petitioner,

v.

Eric H. HOLDER, Jr., Attorney General, Respondent.

No. 08–2485.

United States Court of Appeals, First Circuit.

Submitted July 28, 2009.

Decided Oct. 8, 2009.

Joseph A. MacDonald, on brief, for petitioner.

Tony West, Assistant Attorney General, Civil Division, Thomas B. Fatouros, Senior Litigation Counsel, and Ann M. Welhaf, Trial Attorney, Office of Immigration Litigation, on brief, for respondent.

Before BOUDIN, SELYA and DYK,[*] Circuit Judges.

SELYA, Circuit Judge.

The petitioner, Sovannary Seng, a Cambodian national, seeks judicial review of a final order of the Board of Immigration Appeals (BIA). That order mandated her removal from the United States while at the same time denying her cross-application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture (CAT). Concluding, as we do, that the petitioner's arguments lack force, we deny the petition.

The facts are uncomplicated, albeit disputed in important respects. The petition-

[*] Of the Federal Circuit, sitting by designation.

er lawfully entered the United States on June 1, 2002, by means of a four-month visitor's visa. She overstayed and, on May 23, 2003, filed an application for asylum that cited a fear of persecution on account of her political affiliation. The Department of Homeland Security rejected her application and served her with a notice to appear, charging that she was subject to removal pursuant to 8 U.S.C. § 1227(a)(1)(b) because she had remained in the United States longer than permitted.

The venue then shifted to the immigration court, where the petitioner, represented by counsel, conceded removability. The case was continued and, albeit before a different judge, she offered evidence in support of her cross-application. On direct examination, she testified that she feared persecution because she and her husband had a previous affiliation with both the FUNCINPEC Party and the Sam Rainsy Party (each of which opposed Cambodia's powerful Hun Sen regime). She said that the couple had joined the FUNCINPEC movement in 1992 and, as a result of that involvement, had received numerous threats. The couple had joined the Sam Rainsy Party by 1998, when Hun Sen won Cambodia's quadrennial election.

The petitioner and her husband believed that the 1998 election was rigged and protested the results. As a consequence, they were arrested and detained for three days.

The petitioner next testified that, in November of 2000, police officers arrested her husband at their home, allegedly due to his campaign activities on behalf of the Sam Rainsy Party. He returned the following day, bruised and battered.

According to the petitioner's asylum application, her husband received an appointment early in 2001 to the elections board, for the next election cycle. He was to serve as a representative of the Sam Rainsy Party.

In the wake of that appointment, the police arrested and detained him once again. He escaped from custody, and the police came to the marital dwelling on several subsequent occasions, hounding the petitioner concerning her husband's whereabouts.

In June of 2002, the petitioner departed for the United States. She stayed there, she said, because she feared that the Cambodian authorities would harm her or her children (who still live in Cambodia) should she return.

As the case proceeded, facts emerged that were inconsistent with the petitioner's original account. To cite one example, the petitioner testified that her husband had fled Cambodia on October 1, 2001, and that this was the last time she had seen him. She then testified that she last had seen him in December of 2000. She later testified that her husband's appointment to the elections board occurred in October of 2001, and that they were living together at that time.

To cite another example, the petitioner testified that her husband joined the Sam Rainsy Party in 1992 and that, in 1993, she was threatened with harm unless they withdrew their support for the party. She later stated that her husband did not join the Sam Rainsy Party until 1998. But on redirect examination, she claimed that she had joined the Sam Rainsy Party in 1993. This testimony was especially puzzling because it came to light that the Sam Rainsy Party was not formed until 1998.

The immigration judge (IJ) tried valiantly to clarify the petitioner's testimony but had little success. The petitioner asserted that November of 2000 was the last time she laid eyes on her husband, but continued to insist that her husband had

left Cambodia in October of 2001, which was when she last had seen him. That testimony was, of course, internally inconsistent. To confound the situation further, the petitioner then stated that her husband had served for a year as an elections board member before his arrest and ensuing escape. Given the date of her husband's appointment to the board, that testimony necessarily implied that he had remained in Cambodia until sometime in 2002. When asked several times to explain these and other manifest discrepancies, the petitioner admitted that she was confused and said that she was suffering from memory lapses.[1]

To complete her case, the petitioner introduced amplitudinous background materials describing current conditions in Cambodia. These materials included accounts of police brutality and military force directed at adherents of the Sam Rainsy Party. Prominent among these documents was a 2005 State Department Country Conditions report that attributed a variety of human rights abuses to the Cambodian government.

The IJ denied the petitioner's claims for relief. While he did not go so far as to find that the petitioner had perjured herself, he did find that her testimony was not credible. He based this finding on major inconsistencies in her testimony and her admittedly faulty memory. Having refused to accord probative value to that testimony, the IJ found the remaining evidence insufficient to sustain the petitioner's burden of proof as to any or all of her claims for relief. Consequently, he denied her cross-application and ordered removal.

The petitioner appealed. On October 27, 2008, the BIA affirmed the IJ's deci-

sion. This timely petition for judicial review followed.

■ In matters of this kind, we ordinarily review the final order of the BIA. *See, e.g., Amouri v. Holder,* 572 F.3d 29, 33 (1st Cir.2009). But where, as here, the BIA has adopted the IJ's decision and has not developed an independent rationale, we review the IJ's decision directly. *See Chhay v. Mukasey,* 540 F.3d 1, 5 (1st Cir.2008); *Stroni v. Gonzales,* 454 F.3d 82, 86–87 (1st Cir.2006).

■ The familiar substantial evidence rule governs review of the IJ's factual findings, including his credibility determinations. *Chhay,* 540 F.3d at 5. Under this deferential standard, we must accept the IJ's findings of fact as long as they are "supported by reasonable, substantial and probative evidence on the record considered as a whole." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). In other words, reversal is justified on the ground of factual error only when the evidence is such as would compel a reasonable factfinder to reach a contrary conclusion. *Id.; Bebri v. Mukasey,* 545 F.3d 47, 50 (1st Cir.2008).

■ Questions of law are treated differently. Those questions engender de novo review, with some deference to the agency's reasonable interpretations of statutes and regulations that are within its sphere of authority. *See Muñoz–Monsalve v. Mukasey,* 551 F.3d 1, 5 (1st Cir.2008); *see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

■ This brings us to the merits. We start with the asylum claim.

---

**1.** When it became clear that the Sam Rainsy Party did not exist until 1998, the petitioner attempted to recant her earlier testimony about the inception of her membership in that party. The IJ found that her recantation was too little and too late. That finding is supported by substantial evidence.

██ To qualify for asylum, an alien has the burden of showing that she falls within the statutory definition of "refugee." *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(B); *see also Muñoz–Monsalve,* 551 F.3d at 8; *Bebri,* 545 F.3d at 50. A refugee is an alien who is unable or unwilling to return to her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An asylum applicant's credible testimony alone may suffice to satisfy this burden. *See Bebri,* 545 F.3d at 50; *Settenda v. Ashcroft,* 377 F.3d 89, 93 (1st Cir.2004).

██ This does not mean, however, that an IJ is obliged to accept an asylum applicant's testimony at face value. Should the IJ reasonably determine that the alien's testimony is not credible, he may disregard it in whole or in part. *See Muñoz–Monsalve,* 551 F.3d at 8; *Bebri,* 545 F.3d at 50. Unexplained inconsistencies or contradictions in an alien's version of events may thus derail her asylum claim. *See, e.g., Ying Jin Lin v. Holder,* 561 F.3d 68, 72–73 (1st Cir.2009); *Bebri,* 545 F.3d at 51.

██ The credibility determination in this case is governed by the "heart of the matter" rule.[2] Under that rule, an adverse credibility determination may not rest on discrepancies or inconsistencies that are merely peripheral to the alien's claim; instead, the determination must rest on discrepancies or inconsistencies that are central to the claim (that is, the discrepancies or inconsistencies must go to the heart of the matter). *See Ying Jin Lin,*

561 F.3d at 72; *Bebri,* 545 F.3d at 50; *Zheng v. Gonzales,* 464 F.3d 60, 63 (1st Cir.2006).

The petitioner contends that the discrepancies which marred her testimony were too insubstantial to warrant an adverse credibility determination. We disagree. These discrepancies are major and cut to the core of her foundational claim that her husband was arrested, detained, and mistreated as a result of his political activities and that, after his departure, she had a well-founded fear of similar mistreatment that prompted her to flee. We explain briefly.

The IJ focused on the petitioner's inability to tell a coherent story about her husband's alleged arrest, detention, escape, and flight from Cambodia. She gave at least three conflicting dates, each a year or more apart, as the date she last saw her husband. This was especially important because her husband, an ardent political activist by her account, was the lightning rod both for the harassment that she described and for the future persecution that she feared.

The IJ also focused, of course, on the petitioner's claim to have been politically involved in her own right. He took special note that the petitioner professed to have joined the Sam Rainsy Party in 1993—a full five years before that party came into being. This stark discrepancy was neither minor nor peripheral. It went directly to the foundation of the petitioner's claim.

Taken together, these discrepancies fundamentally undercut the petitioner's asylum application. *See Mam v. Holder,* 566 F.3d 280, 283–85 (1st Cir.2009) (hold-

---

**2.** The Real ID Act of 2005, Pub.L. No. 109–13, § 101(a)(3)(B)(iii), 119 Stat. 302, 303 (codified at 8 U.S.C. § 1158(b)(1)(B)(iii)), eliminates the "heart of the matter" rule in favor of a "totality of the circumstances" rule. *See Mam v. Holder,* 566 F.3d 280, 283 n. 2 (1st

Cir.2009); *Cuko v. Mukasey,* 522 F.3d 32, 38 n. 2 (1st Cir.2008). This new standard only applies to cases in which the initial application for asylum is filed on or after May 11, 2005. *See* Real ID Act § 101(h)(2). This is not such a case.

ing gross discrepancies concerning dates of key events with respect to asylum claim sufficient to justify adverse credibility determination); *Bebri,* 545 F.3d at 51 (holding that an adverse credibility determination may rest on major discrepancies concerning time, place, and manner); *see also Pan v. Gonzales,* 489 F.3d 80, 86 (1st Cir.2007) ("Some of these inconsistencies, in isolation, may seem like small potatoes. What counts, however, is that their cumulative effect is great."). What we said in *Muñoz–Monsalve,* 551 F.3d at 8, is equally apropos in this instance: "Simply put, this is a case in which the petitioner has told different tales at different times."

■ In an effort to blunt the force of this reasoning, the petitioner asserts that the adverse credibility determination cannot stand because the IJ did not regard her testimony as deceitful. This assertion is baseless. Credibility does not necessarily hinge on the declarant's intent. A statement may be untrue (and, thus, not credible) because of lack of knowledge, faulty memory, garbled expression, or other reasons, notwithstanding the declarant's intent to speak the truth.

■ This point is especially telling where, as here, the burden of proof is implicated. If an alien's testimony, whether or not deceitful, is incredible, a court reasonably may conclude that she has failed to carry her burden of proof. *See, e.g., López–Castro v. Holder,* 577 F.3d 49, 52–53 (1st Cir.2009) (holding that petitioner's testimony lacked the necessary specificity to show past persecution on account of ethnic minority); *Chhay,* 540 F.3d at 6– 7 (holding that petitioner had not sustained burden of proof when her testimony

anent political party membership was unconvincing and uncorroborated).

■ We add, moreover, that in order to carry the burden of proof, an alien's testimony normally must be specific and direct. *See Chhay,* 540 F.3d at 6. The petitioner's confused account hardly can be said to measure up to this benchmark.

■ The petitioner complains that, given the harrowing nature of her ordeal in Cambodia, the IJ should have discounted her confusion and faulty memory. That complaint is directed to the wrong adjudicator. Whether or not to excuse a witness's confusion or faulty memory is principally a matter for the factfinder. *See Mam,* 566 F.3d at 283; *Laurent v. Ashcroft,* 359 F.3d 59, 64 (1st Cir.2004).

So, too, is the petitioner's plaint that her limited education and difficulties in translation led to the inconsistencies that plagued her testimony. The evidence on these points is thin [3] and affords no sufficient reason for us to credit the petitioner's bald assertion that she is incapable of relating a simple sequence of important events.

■ The petitioner's last remaining claim suggests that the record as a whole supports a grant of asylum. For this claim, she relies chiefly on generalized reports of country conditions in Cambodia. This reliance is misplaced.

■ The IJ supportably found the petitioner's testimony as to her situation not credible, and that testimony was not corroborated by any other evidence. Without some specific, direct, and credible evidence relative to her own situation, there is an insufficient nexus between the petitioner and the general unrest depicted in the

---

**3.** The record contains only two instances of possible translation errors, both of which the

interpreter quickly corrected.

country conditions reports. *See Chhay*, 540 F.3d at 8 (holding that background evidence cast insufficient light on the individualized issue of alien's claimed membership in the Sam Rainsy Party). While "country conditions reports are deemed generally authoritative in immigration proceedings, the contents of such reports do not necessarily override petitioner-specific facts—nor do they always supplant the need for particularized evidence in particular cases." *Amouri*, 572 F.3d at 35.

 Here, moreover, the petitioner's reliance on country conditions reports reflects a misapprehension of the substantial evidence rule. Under that rule, it is not enough for an alien to show that the evidence in the record can be read to support her position. Rather, she must show that "the record evidence would compel a reasonable factfinder to make a contrary determination." *Segran v. Mukasey*, 511 F.3d 1, 6 (1st Cir.2007) (quoting *Aguilar-Solis v. INS*, 168 F.3d 565, 569 (1st Cir. 1999)). The petitioner has not satisfied this rigorous standard.

There is no need to linger long over the petitioner's claim for withholding of removal. Claims for asylum and claims for withholding of removal have similar elements, but the quantum of proof needed for the latter is more stringent. *Compare* 8 U.S.C. § 1101(a)(42)(A), *and id.* § 1158(b), *with id.* § 1231(b)(3), *and* 8 C.F.R. § 208.16(b). It follows that an alien who cannot prevail on a claim for asylum must also lose on a counterpart claim for withholding of removal. *See Ying Jin Lin*, 561 F.3d at 74; *Segran*, 511 F.3d at 7. That is precisely the situation here.

This leaves the petitioner's claim for relief under the CAT. To prevail on a CAT claim, an alien must show that, more likely than not, she will be subjected to torture if repatriated. *See* 8 C.F.R. §§ 1208.16(c), 1208.18(a)(1); *see also Segran*, 511 F.3d at 7. The petitioner has adduced virtually no evidence to support this claim (to the extent that she relies on her testimony describing police threats supposedly made to her, that testimony is nullified by the adverse credibility determination). Under the substantial evidence rule, general allegations of human rights abuses gleaned from country conditions reports, standing alone, are not enough to defenestrate an IJ's denial of a particular alien's CAT claim. *See, e.g., Amouri*, 572 F.3d at 35.

We need go no further. For the reasons elucidated above, we deny the petition for judicial review.

*So Ordered.*