# United States Court of Appeals
## For the First Circuit

No. 13-1367

HENRY MBOOWA,

Petitioner,

v.

LORETTA E. LYNCH, Attorney General of the United States,[*]

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Howard, <u>Chief Judge</u>,
Lynch and Thompson, <u>Circuit Judges</u>.

<u>William P. Joyce</u> and <u>Joyce & Associates P.C.</u> on brief for petitioner.
<u>Stuart F. Delery</u>, Assistant Attorney General, and <u>Erica B. Miles</u> and <u>James A. Hunolt</u>, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, Department of Justice, on brief for respondent.

July 21, 2015

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Attorney General Loretta E. Lynch has been substituted for former Attorney General Eric H. Holder, Jr. as respondent.

**HOWARD, Chief Judge**.  Petitioner Henry Mboowa, a native and citizen of Uganda, asks us to review a Board of Immigration Appeals ("BIA") order denying his claims for asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT").  The BIA upheld an Immigration Judge's ("IJ") finding that Mboowa's testimony was not credible and, thus, that he was unable to establish eligibility for relief.  After careful review, however, we conclude that the record does not support two of the purported discrepancies that the agency considered critical in discrediting Mboowa's account.  In light of that finding, we grant Mboowa's petition, vacate the BIA's order, and remand for additional proceedings.[1]

## I.

Mboowa was born in Kampala, Uganda in 1976.  He entered the United States through Newark, New Jersey on June 5, 2002, to work as a summer camp counselor as part of an exchange program.  Although his J-1 visa authorized only a temporary stay until September 15, 2002, he has remained in the United States without authorization ever since.

On February 27, 2003, Mboowa applied pro se for asylum but an asylum officer denied his application.  No further action was taken until February 13, 2008, when the Department of Homeland

---

[1] Neither the IJ nor the BIA addressed the substantive merits of Mboowa's claims.  Although those claims were briefed before this court, we decline to address them in the first instance.

Security served Mboowa with a Notice to Appear in immigration removal proceedings. Mboowa appeared with legal counsel at an initial hearing on July 3, 2008, and conceded that the Notice to Appear's factual allegations were accurate. Nevertheless, Mboowa indicated that he would seek asylum, withholding of removal, and protection under CAT, and he proffered his original, 2003 asylum application as support for his claims.

Beyond his 2003 asylum application, Mboowa has recounted the events underlying his claims on several occasions. At the initial hearing on July 3, 2008, in addition to submitting his original application, he provided several documents purporting to corroborate his recollection of events and describing the political conditions in Uganda. Mboowa also filed additional corroborating documents and an affidavit on June 30, 2009. Mboowa then testified before the IJ on December 14, 2010, and once again filed additional supporting documentation.

The political situation in Uganda, where incumbent President Yoweri Museveni has remained in office since 1986, supplies the backdrop for Mboowa's claims. Mboowa alleges that he joined a "youth pressure group" called the Youth Unity Peace Initiative ("YUPI") in 2000. Although initially focused on certain policy issues, the group become directly involved in electoral politics as the 2001 Ugandan presidential election approached. YUPI ultimately supported the opposition candidate, Colonel

Besigye, whom Museveni would defeat in March 2001. Mboowa alleges that his membership in YUPI -- and the group's support of Besigye -- left Mboowa and his family vulnerable to persecution by those loyal to President Museveni, including the Ugandan military and intelligence services.

Mboowa's claims rest primarily on four incidents that took place between 2001 and 2002: a 2001 beating, a 2001 home invasion, the 2002 death of Mboowa's father, and the 2002 beheading of Mboowa's cousin. We briefly describe the facts central to those events according to Mboowa's testimony although, as discussed later, the agency identified certain purported inconsistencies in Mboowa's accounts.

On January 26, 2001, Mboowa and a YUPI colleague, Moses Sekibuule, were accosted and beaten in Kampala. Mboowa alleges that, while the two men were hanging campaign posters supporting Colonel Besigye, more than a dozen soldiers dressed in camouflage suddenly approached in a pick-up truck. They demanded that Mboowa and Sekibuule cease hanging the posters and ordered the two men to lie on the ground. The soldiers proceeded to whip, kick, and beat the two men for twelve to fifteen minutes. As a result of the beating Mboowa maintains that his injuries -- a broken pelvis, deep wounds on his shins, cuts to his knees, and several cuts and a deep gash along the side of his head -- required a three-week hospital

stay.  Sekibuule allegedly lost several teeth and sustained either a broken hand or a broken arm.

A second politically-motivated incident followed on February 28, 2001.  Mboowa recalls that while he was sleeping several armed men broke into his residence, blindfolded him, ransacked his house, vandalized his property, and struck him on the jaw with the butt of a gun.  Before departing, the men allegedly stole several YUPI files and Mboowa's membership card.  Mboowa testified that he gathered the men were from the military intelligence agency because they warned him that "this was the price to pay for not supporting the incumbent president."

The following month, President Museveni defeated Colonel Besigye in the 2001 presidential election.  According to Mboowa, however, the consequences of supporting Besigye did not end with Museveni's successful reelection.  One such consequence, Mboowa alleges, was the mysterious death of his father in March 2002.  His father also had been politically active and, at the time of his death, was the Mobilizing Secretary for a second group, "Reform Agenda," which also had supported Colonel Besigye.  Mboowa asserts that, after not hearing from his father for several days, his family suspected that his father was "detained" (although he does not specify by whom).  At some point, a local dispensary contacted the family and informed them that it was providing care for a man identifying himself as Mboowa's father.  Upon finding his father

malnourished and in poor condition, Mboowa moved him to a hospital. By the time they arrived at the hospital, Mboowa's father's tongue had turned entirely black, and his body was "cold and sweating." Although the medical staff did not know "exactly what was wrong," Mboowa testified that the hospital concluded his father "had signs of poisoning." His father subsequently died during surgery.

Finally, Mboowa testified that his cousin, also an active member of YUPI, disappeared in April 2002 along with another colleague. The family lost contact with the cousin for a number of days but, upon reading a newspaper account of a man who had been shot, Mboowa testified that the family "started piecing things together." The family later learned that Mboowa's cousin and his colleague had been beheaded, and when Mboowa's aunts "went to identify the bodies," they could only do so based on a distinctive "birthmark" on his cousin's body. This act of violence was "the last straw" for Mboowa, prompting him to leave Uganda until "the dust settles."

Primarily on the basis of these four incidents Mboowa testified that he fears he would be detained or killed if forced to return to Uganda. The IJ determined that "the acts of harm described are plausible in light of country conditions, and would rise to the level of past persecution if established." But the IJ deemed Mboowa not credible and was thus "unable to make a finding that these events actually occurred as described." After

cataloging "numerous internal inconsistencies and inconsistencies between his asylum application, affidavits and testimony and supporting documentation," the IJ discredited Mboowa's testimony in its entirety. "[M]ost troubling" to the IJ was that "significant portions of [Mboowa's] testimony, especially his broken pelvis, three week hospital stay, and the beheading of his cousin" were omitted "from his original [2003] application, written only about a year after the events." Without such evidence, the IJ concluded Mboowa had "not demonstrated past persecution on account of a statutorily protected ground." The adverse credibility finding likewise doomed Mboowa's requests for asylum based on the fear of future persecution, withholding of removal, and protection under CAT.

The BIA affirmed, finding that the discrepancies "identified are present and provide specific cogent reasons" for the IJ's adverse credibility determination. The BIA primarily recounted the inconsistencies surrounding Mboowa's description of the 2001 beating, and faulted Mboowa for failing to mention in his supplemental statement[2] (filed as part of his 2003 initial asylum application) that he "was beaten with the guns of the soldiers but

_____

[2] As explained below, the statement consisted of additional allegations and was attached to Mboowa's application for asylum (the I-589 Form) as the application form directs. Although the IJ and BIA referred to this supplement as Mboowa's "first affidavit," Mboowa did not label it as such. We refer to this document as the "supplemental statement," which more accurately portrays the document's purpose and content.

not whipped, that he sustained broken ribs and a broken hip, or that he was hospitalized for 3 weeks." The BIA concluded that Mboowa failed to adequately explain these discrepancies as well as "the other discrepancies that the Immigration Judge identified." The BIA also remarked that several "material inconsistencies that we do not mention here . . . provide further support [for] the [IJ's] adverse credibility determination," and that Mboowa failed to rehabilitate his credibility with corroborating evidence. This petition timely followed.

## II.

Mboowa challenges the adverse credibility determination and resulting denial of his asylum, withholding of removal, and CAT claims. "To qualify for asylum, an applicant must establish that [he] has a 'well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Jin Lin v. Holder, 561 F.3d 68, 71 (1st Cir. 2009) (quoting 8 U.S.C. § 1101(a)(42)(A)). The testimony of the applicant, alone, can suffice to meet this burden.[3] Id. But where

---

[3] Although we need not consider Mboowa's corroborating evidence here because, as explained below, we conclude that the adverse credibility determination, itself, was problematic, we pause to make one observation. We would not endorse the BIA's statement that "[Mboowa] also did not provide reasonably available corroborative evidence to support his claims" to the extent that statement could be read to provide an independent ground for denying the asylum claim. To be sure, a complete "lack of corroboration, easily obtainable were the petitioner's tale true, [may] support[] the adverse credibility determination." Muñoz-Monsalve v. Mukasey, 551 F.3d 1, 8 (1st Cir. 2008). But any

-8-

the agency determines that the testimony is not credible, that testimony "may be discounted or completely disregarded."  Id.  Where, as here, "the BIA has written separately while deferring to and affirming the decision of an IJ, we review both the BIA's decision and the relevant portions of the IJ's decision."  Lutaaya v. Mukasey, 535 F.3d 63, 70 (1st Cir. 2008).

        We review the BIA's and IJ's credibility determination "under the deferential substantial evidence standard."  Dhima v. Gonzales, 416 F.3d 92, 95 (1st Cir. 2005).  That standard "requires us to uphold the ruling unless the record would compel a reasonable adjudicator to reach a contrary determination."  Jin Lin, 561 F.3d at 72.  Our deference to the agency's determination is not unbounded, however.  The "IJ must provide a 'specific, cogent, and supportable explanation for rejecting an alien's testimony.'"  Abdelmalek v. Mukasey, 540 F.3d 19, 22-23 (1st Cir. 2008) (quoting Teng v. Mukasey, 516 F.3d 12, 16 (1st Cir. 2008)).  Under the "heart of the matter" rule, the discrepancies relied upon to support an adverse credibility determination "must pertain to facts

---

holding that an otherwise credible claim is doomed because the petitioner failed to provide corroborating evidence directly conflicts with the applicable regulations.  See 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."); see also, e.g., Segran v. Mukasey, 511 F.3d 1, 5 (1st Cir. 2007) ("An alien's credible testimony may suffice to sustain his burden of proof even without corroboration.").

central to the merits of the alien's claims."[4]   Zheng v. Gonzales,
464 F.3d 60, 63 (1st Cir. 2006).   Discrepancies that relate "merely
to peripheral or trivial matters" are insufficient, alone, to
support an adverse credibility determination.   Id.

Accordingly, we are compelled to uphold the IJ's and
BIA's adverse credibility determination in this case only if:

> (1) the discrepancies and omissions underlying
> the determination are actually present in the
> record; (2) those discrepancies and omissions
> provide specific and cogent reasons to
> conclude that the petitioner's testimony was
> incredible with regard to facts central to the
> merits of [his] asylum claim; and (3) the
> petitioner has failed to provide a convincing
> explanation for the discrepancies and
> omissions.

Jin Lin, 561 F.3d at 72.

The BIA's and IJ's opinions here fail on the first prong
of this inquiry.   After detailing a litany of purported
inconsistencies, the IJ found "most troubling the omission of
significant portions of [Mboowa's] testimony, especially his broken
pelvis, three week hospital stay, and the beheading of his cousin,
from his original application, written only about a year after the
events."   And the BIA subsequently adopted that credibility
determination.   The IJ's recounting of the record evidence is only

---

[4] Because Mboowa filed his asylum petition on February 27,
2003, Mboowa and the government agree that the "heart of the
matter" rule applies to the BIA's and IJ's credibility
determination here.   That rule has since been abrogated by the REAL
ID Act of 2005.   See Seng v. Holder, 584 F.3d 13, 18 n.2 (1st Cir.
2009).

-10-

partially accurate, however. After a careful review, we conclude that although the IJ classified Mboowa's allegations of a broken pelvis and the beheading of his cousin as purported omissions, both claims were consistently present in the record.

What the IJ referred to generally as Mboowa's "initial application" in fact consists of two documents that were filed concurrently. The first is Mboowa's I-589 Form for asylum. Entitled "Application for Asylum and for Withholding of Removal," the I-589 Form is a pre-printed government application form that asks a series of specific questions and provides limited space in which the alien may write or type an answer. Mboowa's form contains handwritten answers to the various questions. The I-589 Form also instructs an applicant to "attach additional sheets of paper as needed to complete [the applicant's] responses." Mboowa did so here. He supplied a typed statement accompanying his I-589 Form that provides further detail regarding some of his claims. In our view, the I-589 Form and the supplemental statement are best viewed as a collective whole.

With that understanding in mind, we proceed to the inconsistencies the IJ purported to identify. The IJ is correct that one portion of Mboowa's initial application -- the supplemental statement -- discusses neither his pelvic injury nor his hospital stay and makes only passing reference to "los[ing] a cousin after being trailed by the military." But the attached I-

-11-

589 Form does disclose his hip injury and describes, in some detail, his cousin's beheading. On page 5 of the I-589 Form, in response to a question asking whether "you, your family, or close friends or colleagues [have] ever experienced harm or mistreatment or threats in the past by anyone," Mboowa hand wrote that he "sustained cuts on the head and a broken hip" during the 2001 beating. On the following page, in response to a question asking whether any family members had been "accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States," Mboowa hand wrote: "On April 3, 2002, my cousin and his colleagues were detained at an undisclosed location. They were interrogated and tortured, in their own country, without notifying any relatives. Their bodies only surfaced three days later, with two of them beheaded."

In concluding that these allegations were absent from Mboowa's initial application, the agency appears to have placed talismanic weight on Mboowa's supplemental statement to the exclusion of the I-589 Form that statement accompanied. But the agency supplied no rationale justifying its focus on the supplemental statement, leaving us with a firm sense that the I-589 Form itself was overlooked.

With these allegations as contained in Mboowa's I-589 Form in mind, it is not accurate to characterize Mboowa's claims of a hip injury and his cousin's beheading as fabrication or

embellishment when those significant details are contained in one portion of Mboowa's initial application (the filing that, as the IJ pointed out, set forth Mboowa's account closest in time to the underlying events themselves). To be sure, the supplemental statement attached to the I-589 Form does not go on to reiterate these factual details, although it does repeat or elaborate on certain events that were described in the I-589 Form. By the same token, the supplemental statement describes several additional episodes not included in the first instance in the I-589 Form's limited space. Fairly viewed on this record, however, any differences among the two contemporaneously-filed documents appear to be elaborations, not internal inconsistencies. Thus, contrary to the IJ's and BIA's characterization, the record reflects that, beginning with his very first filing, Mboowa consistently alleged his hip was injured and his cousin was beheaded. These purported omissions are not "actually present in the record." Jin Lin, 561 F.3d at 72.

Because two of the three central planks of the agency's credibility determination are not supported by the record, we will remand to allow the agency to revisit its credibility determination in the first instance. See Castañeda-Castillo v. Gonzales, 488 F.3d 17, 24-25 (1st Cir. 2007) (en banc) (remanding to permit agency to reconsider credibility determination); see also I.N.S. v. Orlando Ventura, 537 U.S. 12, 16 (2002) ("[T]he proper course,

-13-

except in rare circumstances, is to remand to the agency for additional investigation or explanation." (quoting Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985)).  We note that the absence of Mboowa's three-week hospital stay from both his I-589 Form and his supplemental statement persists from among the three omissions the IJ found "most troubling."  That allegation goes to the heart of Mboowa's claims because it concerns the extent to which Mboowa was physically harmed for backing President Museveni's political opponent. [5]  At the same time, Mboowa's hospital stay is more plausible in light of his consistent allegation of a broken hip, and it might now be understood as an additional detail, rather than an inconsistency.  See Kartasheva v. Holder, 582 F.3d 96, 106 (1st Cir. 2009) (noting that an "added . . . detail about [an] event during [a claimant's] testimony" might not be "implausible given [his] previous descriptions of the incident").

While the agency identified certain other inconsistencies, we are unpersuaded that two of those lingering inconsistencies go to the heart of the matter or amount to

---

[5] We note that the corroborating documents that Mboowa submitted also undermine the allegations regarding his hospital stay.  Because Mboowa claimed in his testimony that the hospital where he was treated lost his records, he provided a letter from his treating physician allegedly reconstructing -- over five years later -- Mboowa's treatment from memory.  But the letter describes only seven days of treatment (rather than three weeks).  While (as Mboowa protests) this discrepancy might be explained by the lapse in time, that explanation is difficult to square with the letter's specific medication dosages.

discrepancies at all. First, the agency emphasized Mboowa's varying descriptions of the 2001 beating. But Mboowa's accounts diverge only slightly and only with respect to the method of that beating. Mboowa initially alleged that he and his colleague were both whipped during the encounter; his later accounts specified that the soldiers used both cow-hide whips and guns to whip and beat the men. Mboowa ultimately testified that he was beaten with the soldiers' guns, while his colleague, Sekibuule, was whipped with cow-hide whips. These differences strike us as "too immaterial to support a finding that no attack occurred at all," Wiratama v. Mukasey, 538 F.3d 1, 6 (1st Cir. 2008) (finding adverse credibility determination unsupported where the record reflected a "disagreement over whether [the petitioner] had been stabbed or merely slashed").

Second, the IJ discredited Mboowa's claim that he was hospitalized for three weeks following the 2001 beating, in part, because he "repeatedly stated that he had never taken time off from his employment." We are unconvinced that there is a discrepancy in this account, however. Despite Mboowa's explanation that he only meant vacation time, the IJ did not "credit this explanation as he consistently said 'a single day' and never specified vacation

-15-

time."  Our review of the record, however, indicates Mboowa did at least imply that he meant vacation time.[6]

### III.

In the ordinary course we do not to attempt to read the tea leaves.  See Castañeda-Castillo, 488 F.3d at 25.  The IJ determined that "the acts of harm [Mboowa] described are plausible in light of country conditions, and would rise to the level of past persecution if established," but found his account incredible.  On remand it is within the agency's purview to evaluate what, if any, impact Mboowa's consistent allegations of his hip injury and his cousin's beheading have on its adverse credibility determination and determine whether any of the remaining purported inconsistencies are sufficient to discredit a portion or all of his account.  The BIA's order is vacated and this matter is remanded for further proceedings consistent with this opinion.

---

[6] In his supplemental statement Mboowa claimed: "I had never taken off a single day, that my vacation was long overdue."  In his 2009 affidavit he reiterated: "In the three years I had worked with Corpcom, I had never taken a single day off, and therefore my vacation was long overdue."